## West Chicago Street Railway Company v. Jessie Krueger, by her Next Friend, Charles Krueger.

1.   JURISDICTION—*Of Parties and Cause of Action Must Appear.*— *Must be Shown by Written Pleadings.*—In a court of record, the plaintiff for the validity of his judgment must see to it that the defendant is brought or comes into court, and that there are written pleadings showing a cause of action over which the court has jurisdiction. And unless such written pleadings be filed by the plaintiff, there is nothing for the defendant to answer, and he need not appear, because only upon such pleadings can a judgment be taken against him.

2.   PRACTICE—*Effect of Failure to file Plea.*—Proceeding to trial as if an issue had been made up, when the defendant has failed to file a plea, is a waiver of a formal issue, and the irregularity will be cured by verdict.

3.   TRIALS—*Improper Remarks by Counsel.*—Counsel should not be allowed to state to a jury, facts which have not been proven on the trial, and an attempt to do so should be stopped by the court without waiting to be called upon by the opposite party.

4.   SAME—*Improper Remarks by Counsel—When Ground for Reversal.* —Where an examination of the record leads a court of appeal to the firm conviction that a very large and most unusual verdict was the re-

sult in some measure of inflammatory and improper remarks by counsel, the judgment rendered in pursuance of such verdict will be set aside.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. NATHANIEL C. SEARS, Judge, presiding. Heard in this court at the October term, 1896. Reversed and remanded. Opinion filed January 21, 1897.

### STATEMENT OF THE CASE.

This was an action on behalf of Jessie Krueger, by her next friend, Charles Krueger, to recover damages for personal injuries sustained by reason of alleged negligence on the part of the West Chicago Street Railroad Company. The declaration, which consists of four counts, alleges that on June 27, 1892, while the plaintiff, who was then a child of about five years of age, was crossing Madison street, near its intersection with Sangamon street, in the city of Chicago, the defendant, by its servants, in control of a Madison street cable train, failed to give warning by the ringing of a bell, gong, or otherwise of the approach of the train; to run the train at a safe rate of speed; to make proper and efficient efforts to stop the train before it struck the plaintiff; to keep a proper watch or lookout for persons passing across the tracks. In consequence of which negligence it is alleged the plaintiff was struck by the car and wounded, so that it became necessary to amputate her left leg, and other parts of the body were so badly bruised that she became and has since remained sick and disordered; that as the direct result of the wounds so received, the plaintiff has suffered, and will hereafter suffer, severe and permanent bodily injury and mental torture; that she was permanently crippled, on account of which she will always be subject to extreme anguish of mind, and her matrimonial prospects materially lessened, if not absolutely destroyed; that she was confined to her bed for a long space of time, and is now and will hereafter be prevented from attending to her affairs and business, and will thereby be deprived of large profits and gains which she would otherwise have gained.

At the trial, the jury returned a verdict in favor of the

plaintiff, and assessed her damages in the sum of $50,000. The trial judge required the plaintiff to remit $15,000, and entered judgment against the defendant in the sum of $35,000.

From this judgment the defendant appeals.

EGBERT JAMIESON and JOHN A. ROSE, attorneys for appellant.

CASE, HOGAN & CASE, attorneys for appellee; SIMEON P. SHOPE, of counsel.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

The record fails to show any plea by the defendant. It is therefore urged that the verdict was rendered in a case where no issue had been formed, and should, for that reason, be set aside.

The record does show that the defendant demurred to the original declaration, consisting of four counts; that this demurrer was overruled, and the plaintiff permitted to file an additional count, which was afterward withdrawn from the jury. The record further shows that the defendant appeared and voluntarily went to trial as if the plea of the general issue had been filed, and introduced evidence which it would not have had the right to do had not such plea been filed. As a part of the order overruling the demurrer, the record reads : " The defendant required to plead herein within ten days from this date;" that order was entered on September 29, 1894. The case went to trial on the 6th day of January, 1896.

Appellant is now seeking not only to take advantage of its having failed to comply with an order of court, but of that which it is manifest worked no harm to it.

The case is very different from that of Waggoner v. Green, 40 Ill. App. 648, in which no declaration had been filed.

In a court of record the plaintiff, for the validity of his judgment, must see to it that the defendant is brought or

comes into court, and also that there are written pleadings showing a cause of action over which the court has jurisdiction. Thus jurisdiction over the person and subject-matter is made to appear.

Unless such written pleading be filed by the plaintiff, there is nothing for the defendant to answer, and he need not appear, because only upon such pleading can a judgment be taken against him. Black on Judgments, Secs. 84 and 183; Van Vleet on Collateral Attack, Secs. 59 to 62.

The defendant is not called upon to do anything to show jurisdiction. If he is brought or comes into court, jurisdiction over him is obtained; his plea confers no jurisdiction, and his failure to plead deprives the court of no right; on the contrary, it confers a right to enter his default, or, to speak more accurately, he thus deprives himself of a right he otherwise had.

Proceeding to trial as if an issue had been made up, when there has been a failure to make an issue, is a waiver of the formal issue, and the trial will be treated as though an issue by plea had been formally tendered. Douglas v. Matson, 35 Ill. App. 538; Strohm v. Hayes, 70 Ill. 41; Ross v. Reddick, 1 Scam. 73; Kelsey v. Lamb, 21 Ill. 559; Barnett v. Greff, 52 Ill. 170; Armstrong v. Mock, 17 Ill. 166.

During the closing argument of counsel for appellee, the following occurred :

" Mr. Case : Not a single man, woman or child on their side saw that coal wagon except that gripman, who put it there to save himself, and Selle, who, I believe, did not see it at all, says that the coal wagon came from the east and went north. Now that coal wagon was put ahead there to shield himself. Why, he says he has no motive to shield himself. Hasn't he? Suppose he is out, and sore at the company, so he wants to exculpate himself, don't he? But I will tell you what he does do. He brings the liability on that company after shielding himself beyond a possibility of doubt, because he tells you in answer to their own questions, speaking of the brake on that car, that the brakes had been bothering him on that very occasion; that the brake didn't stop.

Mr. Mason: Exception.

Mr. Case: This is evidence which they themselves read, to which I made no exception, for I saw it was going to hoist them. He lays it on the brake. He says the brake wasn't at the very best, and when it comes—after explaining why he was discharged, he says: . "That brake had been bothering me on that very occasion," and that Crawford came along, and Crawford said something, and that they had words. The brake was out of order and they brought that out, and so the gripman wants to put the responsibility where it belongs, on the brake, and we say it makes no difference where it was, whether it was the brake or the failure on his part to look north, or the failure to ring the bell, it makes no difference.

Mr. Mason: I take an exception.

There wouldn't have been any outcry, gentlemen, if the gripman had had his hand on the grip and slacked his speed —he had all the way across Sangamon street in which to stop. He could have seen that child if he had been looking. But it was the outcry of the passengers, the protest against the reckless character of this gripman, that called his attention to the child.

Mr. Mason: Exception.

That gripman tells you that he can stop a car in ten or twelve feet, in the face of the testimony of their own gripman—and he gives the reason that he could not stop it— that that brake was out of order; he don't want to exculpate himself, but he tells you that he can stop a train of cars in ten or twelve feet.

Mr. Mason: I want to save an exception to the statement by counsel.

The Court: The court has announced his ruling that there can be no recovery on the ground of a defective brake, nor should such a ground be urged on the jury, and to urge it would be error.

Mr. Case: Where were that gripman's eyes? Why didn't he see the little girl when she left the sidewalk? She had a right to be there. These are public streets. Mad-

ison street is one of the public streets of the city. We have just as much right to be there, and more right to be there, than the street car lines, because they have to operate their machinery of death with care.

Mr. Mason : I take an exception to that statement.

Mr. Case : They have got these juggernauts, modern juggernauts, that crush and mangle and maim.

Mr. Mason : I take an exception.

The Court : Save your exception.

Mr. Case : Who is it that must take care if you point a gun at me ? Isn't it for you to take care that you do not pull it—not for me to see that you do not pull it ? You have got a deadly weapon in your hands; you must exercise care, not I. This gripman stood here with a gun, a modern instrument of death, and it was his duty to have his eyes to the right and to the left to see that every one that left the sidewalk was protected. He did not do it, and that is as clear in this record as the daylight out there.

Mr. Mason : I take an exception.

The Court : Save your exception.

Mr. Case : Why, gentlemen, I have been trying cases of this kind for the last twenty years, and I am not astonished at the gentleman's attitude of prayer in this case; when they get up and plead for mercy—mercy—what mercy did the gripman show this little child ? What mercy or care did he exercise toward her ? Are you going to be governed by sentiment, or are you going to do what is right ? Are you going to apply your common sense ? You know that if the gripman had been looking the child would not have been struck; you know that if he had exercised any care whatever, she would not have been crippled and ruined for life, and I tell you when men, through a gripman, operate these dangerous implements of death, they must abide the consequences, and when gentlemen get up here and talk to you about public highways, it is done to deceive you. They do not see fit to tell you that public highways of this character are run for private profit.

Mr. Mason : I take an exception to that.

The Court: Yes, the question of private property is not in here.

Mr. Case: I do not know that they make any profit; there is nothing in the evidence, but I say these highways are run for the benefit of the people who are interested in them, and I say when they operate death dealing instruments on them, they must abide the consequences, and I do that, gentlemen. I do not appeal to your prejudices. I do not ask you to harden your hearts against this company, or steel it against this little girl. I want you to do by this little girl what you would want the jury to do by you under the circumstances.

Mr. Mason: I will save an exception.

The Court: Yes."

We have no doubt that counsel for appellee, by an innocent misapprehension, misstated the testimony of the gripman as to the brake. His testimony was not that on the trip during which appellee was injured, the brake had been "bothering him;" the trouble with the brake, of which he spoke, occurred in February, 1894, he being discharged immediately afterward; the accident to appellee happened in June, 1892. What the witness stated as to the condition of the brakes on the day of the accident was that they were not the best; that they were as good as the average.

The effect of the misstatement was, however, the same as if it had intentionally been made, and was to induce the jury to believe that the plaintiff had been injured because, among other things, the defendant had allowed its machinery to get out of order. Counsel remarked: "The brake was out of order, and they brought that out, and so the gripman wants to put the responsibility where it belongs, on the brake; and we say it makes no difference where it was, whether it was the brake or the failure on his part to look north, or the failure to ring the bell, it makes no difference."

Although the court did properly remark that there could be no recovery on the ground of a defective brake, yet the court did not, and probably, under the law permitting

written instructions as to the law only, was powerless to protect the defendant from the malign influence of the unwarranted statement that the brake was out of order. To have admitted evidence that the brake was out of order would, under the issues, have been error and cause for reversal; what, then, shall be said as to so forcible a claim to the jury that such evidence existed?

In no proper sense can a grip car be termed an "instrument of death." True, people may be, and sometimes are, killed by such cars; so, too, are they by ordinary wagons, as well as by the most useful and common of utensils and implements.

These can not, for this reason, be properly spoken of as instruments of death, because such is not the purpose for which they are designed or used.

There was no evidence tending to show that the gripman was actuated by malice, ill will or evil intent, in anything that he did, or that he was lacking in the qualities of mercy common to men. To insinuate that he failed to show mercy to the heedless child he saw before him, was not only unjust to the defendant, but cruel to a man who earned his bread by hard work, and whose sense of what is noble, what humanity demands, and desire to be respected by his fellows may be as keen as that of the eloquent counsel who thus stated, or that of the judge who sits upon the bench.

Upon a trial conducted according to the common law, the judge, in summing up, after pointing out what there was evidence tending to prove, would have called attention to the fact that there was no evidence that the gripman was merciless, or that the brake was out of order, and after stating what the questions of fact to be determined by the jury were, would have stated to it the law applicable to the case. The subject could thus have been intelligently and justly placed before the jury.

Under our system of practice, there is practically nothing which the court can do to remove the poison engendered by a maliciously unfair and unjust statement of counsel, save to grant a new trial. Whether the court will, for such

cause, grant a new trial, is a matter resting in its discretion.
If from all that was done, as well as from the verdict, the
court is of the opinion that the jury were not thus improp-
erly influenced, and that the verdict is in no measure the
result of such unfair means, and that the parties have had
the trial by jury which, under the constitution and law of
this State, is their right, the verdict should not, for the mis-
conduct of counsel, be set aside. Harms v. Stier, 67 Ill.
App. 634; W. C. St. Ry. Co. v. Annis, Supreme Court of
Ill., opinion filed Nov. 9, 1896; McDonald v. The People,
126 Ill. 150.

In the case at bar, after listening to the address before
quoted, the jury rendered a verdict of $50,000 for the plaint-
iff. The sum is startling by its magnitude. While it is
true that it may be said that this sum is not an adequate
compensation for the injury to appellee, and that no amount
could be declared to be a complete compensation, yet it is
not the case that the award of damages for such an injury
rests in the uncontrollable discretion of a jury.

The verdict in this case is, for a personal injury, the largest
we have ever been called upon to consider. Instances of
injuries as severe as those of appellee, the result of alleged
negligence, have been called to our attention, and verdicts
therefor rendered have been brought before us, but in no
other instance has a jury awarded so large a sum. The
amount here given exceeds by many thousand dollars that
which any other jury has, to our knowledge, awarded.

Equal justice should be administered to all. We, indeed,
know that the attainment of this high ideal is impossible,
yet our duty to strive for it remains, and is ever to be kept
in mind.

Our experience leads us, irresistibly, to the conclusion
that the very large and most unusual verdict rendered in
this case, was the result, in some measure, of the inflamma-
tory and improper address of counsel. So believing, we
feel compelled to set aside the judgment rendered.

The trial court, enforcing a remittitur, entered judgment
for $35,000. This action was most commendable, so far as

it went, but left the plaintiff in possession of substantial fruits of an unfair proceeding.

It is argued that the defendant confined itself to objecting to the remarks of counsel, and did not call for a ruling thereon. The speech of counsel was urged as ground for a new trial, and this we think sufficient to present the question.

As to continued interruptions during an address and an insistence of a ruling thereon by the court at that time, the remarks of the court in Berry v. The People, 10 Ga. 511, are appropriate. Lumpkin, Judge, said : " It is contended that it was the duty of the court to have stopped the counsel or to have disabused the minds of the jury, by way of charge, from the improper impressions thus produced. That the practice complained of is highly reprehensible, no one can doubt. It ought in every instance to be promptly repressed. For counsel to undertake by a side wind, to get that in as a proof which is merely conjecture, and thus to work a prejudice in the mind of the jury, can not be tolerated. Nor ought the presiding judge to wait until he is called on to interpose. For it is usually best to trust to the discrimination of the jury as to what is, and what is not, in evidence, than for the opposite counsel to move in the matter. For what practitioner has not regretted his untoward interference, when the counsel thus interrupted, resume, " Yes, gentlemen, I have touched a tender spot; the galled jade will wince; you see where the shoe pinches.' "

The judgment of the Superior Court is reversed and the case remanded.

Mr. Justice Gary.

This court of late years has not done its duty upon objections to verdicts because of the conduct of attorneys.

It may not be too late to do works meet for repentance.

Mr. Presiding Justice Shepard.

I do not think the judgment ought to be reversed altogether, because of the assigned improper argument of counsel.

In cases of personal injury where this court shall, for any such reason as appears in this record, be satisfied that the verdict was excessive, my opinion is that public convenience and justice to the litigants is best served by requiring a remittitur to be entered as a condition to an affirmance.

In this case, the injured girl suffered the loss of an entire leg, up to the hip, through the negligence of the appellant as found by the jury, and is meritoriously entitled to a recovery of substantial damages by way of compensation. Why, then, remand the cause for another trial, at great expense to the public, and deprivation to the injured one, when upon such other trial it is almost certain a recovery for a considerable amount will be had, without, at least, giving to her and her advisers the opportunity to say that she will accept a sum that this court may, upon a consideration of the whole case, think would be to her a just compensation under the law? Reversed and remanded.