# Pennsylvania Co. and Pennsylvania R. R. Co. v. Louis P. Greso.

1. EXCESSIVE DAMAGES—*Where a Remittitur Does Not Cure.*—Where the assessment by the jury of the damages is so grossly excessive as to warrant the conclusion that the verdict was the result of passion, prejudice, misconception, or undue sympathy, a remittitur does not cure the vice of the verdict.

2. RAILROADS — *Right to Limit Liability for Negligence Does Not Apply to Passengers for Hire.*—The rule that a railroad company may by contract limit its liability for all negligence except gross negligence does not apply to a passenger paying fare.

2. SAME—*Shippers Traveling in Charge of Cattle—Drover's Pass.*—A person traveling on a railroad train on a drover's pass, in charge of cattle, is a passenger for hire, the consideration for his passage being the service he renders in taking care of the cattle, or the charge made against him or his employer for shipping the cattle.

4. SAME—*Degree of Care, as Carriers of Passengers.*—" Ordinarily, carriers of passengers, while not insurers of absolutely safe carriage, are held to the exercise of the highest degree of care, skill and diligence practically consistent with the efficient use of the mode of transportation adopted."

5. SAME—*Liability, When Operating Trains on Other Roads.*—Where one railroad company is operating its trains upon the track of another, by an agreement or arrangement between the two, both are equally liable for the negligent acts of the employes of the company so operating its train.

6. PRACTICE—*Order of Arguments.*—The plaintiff may waive the opening if he desires, then, if the defendant waives argument on his part, the case will go to the jury without argument. But when the plaintiff waives the opening and the defendant makes an argument, the plaintiff has the right to close, although he has made no argument.

7. SAME—*Objections to Improper Remarks.*—It is the right of counsel to object to improper remarks made by the opposing counsel in his argument to the jury, and to insist on a ruling; and in case the court rules, or, being requested so to do, refuses to rule, the objection can be preserved by exception; but unless there is a ruling or a refusal to rule on request, an appellate court can not, as a general rule, review the matter.

8. SAME—*An Improper Practice.*—The practice of having all improper remarks of counsel in argument understood as excepted to for the purpose of obviating the necessity of interruptions is not proper. Counsel have the right to have objections to remarks of opposing counsel passed on by the court at the time they are made and in the presence of the jury.

9. Appellate Court Practice—*Where no Appeal is Taken from an Order.*—Where no appeal is taken from an order overruling a motion to vacate a judgment, the Appellate Court, on appeal from the judgment alone, can not review such order.

**Trespass on the Case,** for personal injuries. Trial in the Superior Court of Cook County; the Hon. Philip Stein, Judge, presiding. Verdict and judgment for plaintiff. Appeal by defendant. Heard in this court at the March term, 1898. Reversed and remanded. Opinion filed December 6, 1898.

Geo. Willard and Lantz & McElligott, attorneys for appellants.

Edward A. Rosenthal and Brandt & Hoffman, attorneys for appellee.

Mr. Justice Adams delivered the opinion of the court.

This appeal is from a judgment rendered in an action for personal injury. The jury rendered a verdict for $15,000, and on motion by appellants for a new trial, the appellee remitted $7,000, and the court overruled the motion and rendered judgment for $8,000.

Appellee was in charge, as the agent of the owner, of eighteen carloads of stock, shipped from Chicago on the road of the Pennsylvania Company, and consigned to Millstone Junction, New Jersey, via the Pennsylvania Railroad Company. When the train reached what is called Outer Depot, at Alleghany City, it was cut off, and ten other cars loaded with live stock and a caboose were attached to it, and it proceeded east, hauled by two engines, to the East Liberty Stock Yards, in Pittsburg. Between Outer Depot and Dallas are the stations Twenty-eighth street, East Liberty and Fifth avenue, which are reached in the order named proceeding east. East Liberty is the west end and Dallas the east end of the Stock Yards, where cattle are unloaded for transfer from the Pennsylvania Company's road to that of the Pennsylvania Railroad Company.

It is about a mile from East Liberty to Dallas, and Fifth avenue is about half way between the two. The train

made only one stop between Alleghany and Dallas, namely, at Twenty-eighth street, and stopped there merely long enough for the conductor to report to the operator there and get orders.    The train crew consisted of Carothers, conductor; McVicker, engineer in charge of the engine next to the train; Hollinger, in charge of the engine in front; Welsh, Sommerfield and Haldeman, brakeman, and two firemen.    McVicker, the engineer next the train, managed the stopping of the train, under orders from the conductor, communicated by signals.    The train stopped at or near Dallas for the purpose of backing, by means of a switch, into East Liberty Stock Yards.    When it stopped, the appellee, who was in the caboose, fell or was thrown down.    His situation when found, which was immediately after the train stopped, is thus described by Brakeman Haldeman, a witness for appellants, who, at the time of the accident, was on the step of the caboose, on the right hand side of it.

" The first thing that called my attention to the plaintiff, I seen him on the platform, and I heard a kind of noise then, and I turned around and looked and saw him on the platform.    His breast was against the guard rails and one foot back on the door, and his left hand down between the draw heads."

Appellee testified that he was thrown onto the platform of the caboose, and lay partly in and partly outside the door. His left leg was broken.    The physicians describe, in substance, the place of fracture as being in the lower third of that part of the leg between the knee and ankle.    Appellee also claims to have suffered a rupture in the groin, and to have had a rib fractured.    The accident occurred November 2, 1895, about 12:05 a. m.    It is claimed in various counts of the declaration that the accident occurred by reason of the unskillful, negligent, etc., sudden and violent stoppage of the train, without notice or warning to appellee.

Appellee was the only witness affirming the alleged negligence.    He says:

" When I was there near Dallas, why, the engineer suddenly put on the air.    I was standing holding what they

call the lookout.    I had a firm hold, I wanted, to be solid.
The lookout is the cupola where the trainmen look over the
train.    I had hold of that, and standing there, and the first
thing I knowed they put on the air suddenly and it threw
me forward."

In another place, he says, " the train stopped just as quick
as lightning."    He knew the cars were to be unloaded at
East Liberty Stock Yards, and was familiar with the yards,
having been there, as he says, " probably five or six hundred
times before."    He had been a drover for twenty-five years,
and his business as drover, was to care for cattle while
being transported from place to place.    Appellee further
testified:

" After the train started from Alleghany, it was about
forty-five minutes before it stopped.    At the time it
stopped, it was going about thirty miles an hour, I should
judge.    East Liberty is right close to Dallas; probably a
half a mile west.    The track is straight from East Liberty
to Dallas.    From Alleghany to Dallas is between four and
five miles."

This evidence contains within itself a manifest contradic-
tion of the statement that the speed of the train was thirty
miles per hour.    Thirty miles per hour, or a mile in two
minutes, would have taken the train from Alleghany to
Dallas (five miles) in ten minutes, whereas if it took forty-
five minutes to make the trip, the rate of speed was six and
two-thirds miles per hour.

In the first count of the declaration it is averred that the
train was going at an ordinary rate of speed, and in the
second and third counts it is alleged it was proceeding
slowly.    The rate of speed is not mentioned in other counts.
The witnesses for the defense testify to the speed of the
train at the time the signal was given to stop, as follows :
Haldeman and Carothers, between three and four miles per
hour; Sommerfield, McVicker and Hollinger, four to five
miles per hour.    The evidence also is that the train went
about 200 feet after the air was applied.    It further appears
from the evidence, that Welsh and Carothers both got off
the train while it was moving, the former two-thirds to

three-quarters of a mile west of the place where it stopped, and the latter just before giving the signal to stop, which could not have been safely done had the speed of the train been thirty miles per hour.

As to the application of the air to the brakes, McVicker, in charge of the engine next to the train, testified that on receipt of the signal he gradually applied the air the usual way; that the governor was set at sixty-five pounds pressure, and he applied about ten pounds, and the train slowed up and stopped slowly. Appellants' witnesses concur in testifying that the train stopped slowly and that there was no unusual jerk or jar. There are other matters in relation to which appellee is contradicted by appellant's witnesses. We refrain from commenting further on the evidence, and also from any expression of opinion as to the preponderance of evidence, inasmuch as there must be another trial of the cause for reasons hereinafter stated.

The evidence is that appellee's leg was broken as heretofore stated. There is some evidence that the broken leg is from one-eighth to one-half inch shorter than the other one, but the witnesses agree that this may be overcome by wearing a thick soled shoe on the left foot, or by other artificial means. There is evidence that appellee has inguinal hernia, but the evidence is conflicting as to whether this was caused by the accident. The evidence is that wearing a truss would relieve and probably cure the hernia. In view of all the evidence, we think the assessment by the jury of the damages at the sum of $15,000 so excessive as to warrant the conclusion that the verdict was the result of passion, prejudice, misconception, or undue sympathy with appellee on the part of the jury, and we are of opinion that the remittitur did not cure the vice of the verdict. T. Nicholson & Sons v. Wm. O'Donald, 79 Ill. App. 195.

Appellants have offered and put in evidence the following document, which appellee admitted signing :

" In consideration of the carriage of the undersigned upon a freight train of the carrier or carriers named in the within contract, without charge other than the sum paid or

to be paid for the carriage upon said freight train of the live
stock mentioned in said contract, of which live stock he is
in charge, the undersigned does hereby voluntarily assume
all risk of accidents or damage to his person or property,
and does hereby release and discharge the said carrier or
carriers from every and all claims, liabilities and demands of
every kind, nature and description, for or on account of any
personal injury or damage of any kind sustained by the
undersigned so in charge of said stock, whether the same be
caused by the negligence of the said carrier or carriers, or
any of its or their employes, or otherwise.

Louis P. Greso.<br>Karler Albrecht."

Appellee, against the objection of appellants' counsel,
was examined by appellee's counsel, and also by the court,
as to whether he read it before signing, and under what
circumstances he signed it, and the objection is relied on
here.    We regard the ruling of the court as immaterial, for
the reason that the document was inadmissible in evidence.
In I. C. R. R. Co. v. Beebe, 174 Ill. 13, it is held that the
rule that a railroad company may by contract limit its lia-
bility for all negligence except gross negligence, does not
apply to a passenger paying fare, and that when one is
traveling in charge of cattle on a drover's pass, as was the
appellee, he is a passenger for hire, the consideration for
his passage being the service he renders in taking care of
the cattle, or the charge made against him or his employer
for shipping the cattle.    By the shipping contract in the
present case, the shipper, appellee's principal, was required,
at his own risk and expense, to load, take care of, feed and
water the stock while being transported, and the very
document relied on by appellants' counsel recites that the
consideration of appellee's passage is the sum paid for the
carriage of the stock.

The court, in the case last cited, which was a similar case
to the present, say:    " Inasmuch as the deceased was a pas-
senger, the degree of care required of the appellant for his
safety was the 'highest reasonable and practicable skill,
care and diligence,' " citing C. & A. R. R. Co. v. Arnol, 144
Ill. 261.    What is reasonable and practicable in the opera-

tion of a passenger train may not be in the operation of a freight train, and this is recognized in C. & A. R. R. Co. v. Arnol, *supra*, the court saying : " It is not to be expected that there will be the same particularity in drawing up to a station by a freight train as by a train devoted to passenger service. The great length and weight of such trains and the appliances necessary in their operation, render them less easy of control." Ib. 268. And the court announces the rule as to care thus : " Ordinarily, carriers of passengers, while not insurers of absolutely safe carriage, are held to the exercise of the highest degree of care, skill and diligence practicably consistent with the efficient use of the mode of transportation adopted." Ib. 271.

Appellants' counsel insist that the Pennsylvania Railroad Company is not liable, for the reason that it did not operate the train on which the accident occurred. The evidence is that the train was operated by the employes of the Pennsylvania Company, and that at the time of the accident it was being operated on the track of the Pennsylvania Railroad Company by some agreement or arrangement between the two companies—certainly by the permission of the latter company. In such case the companies are equally liable. Penn. Co. et al. v. Ellett, 132 Ill. 654.

It is objected that the trial court erred in its ruling in reference to the order of argument. Counsel for appellee announced that he desired to make only one argument to the jury, namely, the last or closing argument; when counsel for appellants said he did not wish to make any argument except in answer to the argument for appellee; but the court ruled that appellee's counsel might make the closing argument to the jury without making an opening argument, and in the absence of any argument by appellants' counsel. This ruling was erroneous. In Trask v. The People, 151 Ill. 523, the court say: " Under the practice in this State the plaintiff may waive the opening if he desires; then, if the defendant waives an argument on his part the case will go to the jury without any argument. But when plaintiff waives the opening and the defendant makes an

argument, the plaintiff has the right to close, although he has made no argument. This we regard as the established practice." After the court had ruled as stated, appellant's counsel argued the case to the jury, and we are of opinion that in so doing he waived his exception.

Certain remarks of counsel for appellee are objected to as unwarranted by the evidence and tending to create prejudice in the minds of the jury. The record fails to show that there was any ruling by the court on the objection, and therefore there is nothing to review. It is the right of counsel to object to improper remarks made by the opposing counsel in his argument to the jury, and to insist on a ruling, and in case the court rules, or, being requested so to do, refuses to rule, the objection can be preserved by exception; but unless there is a ruling, or a refusal to rule on request, an appellate court can not, as a general rule, review the matter. In the present case, after appellant's counsel had excepted for the second time, the court said : "The better way is to have all the remarks understood as excepted to, and it will save the necessity of these interruptions." Such is not the proper practice, for obvious reasons. Counsel has the right to have his objection to remarks of the opposing counsel, which he deems improper, passed on by the court at the time they are made and in the presence of the jury, so that their effect, if improper, on the minds of the jury, may be obviated as far as possible by the ruling of the court. The practice suggested by the court would permit the counsel objecting to note in his bill of exceptions objections to remarks of the opposing counsel, which did not at all occur to him on the trial, and which, had they been then made, the opposing counsel might have withdrawn the remarks in such manner as to remove their effect on the jury.

Exceptions to the refusal of appellants' instructions are sufficiently answered by the preceding part of this opinion.

The judgment was entered November 13, 1897, at the November term, 1897, of the court. January 10, 1898, at the January term, 1898, of the court, appellants, by their

counsel, moved to vacate the judgment on the alleged ground, supported by affidavits, that one of the jurors before whom the cause was tried was an alien. The court overruled the motion, and this is assigned as error.

The only appeal before us is from the judgment of November 13, 1897. There is no appeal from the order overruling the motion to vacate that judgment. We can not, therefore, review the order.

We are of opinion that the case should be submitted to another jury. The judgment will be reversed and the caused remanded.

Reversed and remanded.