## T. Nicholson & Sons v. William O'Donald.

1.  EXCESSIVE DAMAGES—*When Not Cured by a Remittitur.*—Where the verdict is the result of passion, prejudice, misconception or undue sympathy, the error of the verdict is not cured by a remittitur.

2.  VERDICTS—*When the Verdict is Invalidated.*—When a verdict in a personal injury case is tainted with something which vitiates it to a material part of its extent, it is a serious question if its other part may be ripened into a wholesome judgment—whether the vice that contaminated a part does not permeate and invalidate the whole.

3.  ATTORNEYS—*Improper Remarks in Argument.*—Where remarks of a character likely to prejudice the jury against the defendant are made by the plaintiff's attorney, in the hearing of the jury, the verdict, if excessive, may be considered as the result of prejudice, and a remittitur does not cure it.

**Trespass on the Case,** for personal injuries. Trial in the Circuit Court of Cook County; the Hon. JOHN GIBBONS, Judge, presiding. Verdict and judgment for plaintiff. Appeal by defendant. Heard in this court at the March term, 1898. Reversed and remanded. Opinion filed December 6, 1898.

WM. M. JOHNSON, attorney for appellants.

WORTH E. CAYLOR and WILLARD GENTLEMAN, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment in favor of appellee in an action by him against the appellants to recover damages for an injury to his person. The jury found appellants guilty, and assessed appellee's damages at the sum of $10,000. On motion for a new trial, appellee's counsel, on suggestion of the court, remitted $5,000, and judgment was entered for $5,000. It was assigned as a reason for a new trial, and is relied on here, that the verdict is not supported by the evidence; that it is excessive, and the result of passion and prejudice, and that the error was not cured by the remittitur.

The plaintiff, in his testimony, describes the circumstances of the accident substantially as follows: He says that on the morning of June 16, 1896, he went with his team and wagon to the rear of a building fronting on Madison street, in the city of Chicago, for the purpose of hauling from there for his employers a load of puncheons or large hogsheads. After his wagon was nearly loaded, and while he was standing just inside the door of the building from which the puncheons were being removed, he noticed some stuff falling outside; that when he saw this, and also other stuff lying on the ground, he went out and commenced tying up his load to get away from there, and that as he was so doing, he was struck on the head with something, he don't know what. There was a platform in the rear of the building, extending out from the rear wall about ten or twelve feet, to the edge of which appellee had backed up his wagon for

Nicholson & Sons v. O'Donald.

the purpose of loading.  He says that before he was struck he saw several pieces of mortar fall and looked up and saw the heads of men working projecting over the wall.  The evidence shows that men were engaged in working on the top of the wall who, it is claimed, were in appellant's employ.  None of the witnesses who were present at the time of the accident saw appellee struck, or knew what struck him.  There is no evidence that any brick fell from the wall, nor is there any evidence that any large piece of mortar fell, except it may be inferred from the injury to appellee.  As to the result of being struck as stated, the appellee says that at the time of the accident he weighed about 158 to 164 pounds, and that when he first went to work after the accident, as hereafter mentioned, he weighed 112 pounds; that he remembers nothing immediately after the accident, except saying he wanted to go home, or something like that; that the next he remembers he was lying in bed with "extensive pains" in his head and back; that ten days or two weeks after the accident, he was again unconscious; that some days he would feel fairly well, other days not, till finally he got so he could sit up and dress himself; that it was about three months before he started to walk with a crutch and cane; that he afterward discarded the crutch and went to work.  When he went to work, he says, he employed a young man to help him with his wagon, who did the lifting and also assisted in driving.  Describing his condition, he says :

"At the time I was working and after I quit work, after the accident, I had extensive pains in my back.  I couldn't lift nothing and I had pain in my head also.  I would often jump up at night out of a sound sleep with pain in my head and in my back, and I had to walk the floor.  The last time I had to walk the floor was last Sunday night, for two or three hours.  I may walk the floor to-night, and I may rest easy for a night or so, and then it will come on me again.  This has been my general condition, more or less, ever since I was hurt.  Before that I had nothing of the sort."

He says if he looks straight at a lamp, his eyes will give out, and that if he stoops he becomes dizzy.  Dr. Campbell,

witness for appellee, visited him the morning of the accident, June 16th, examined his body all over, and did not find any bruises or abrasions on his person, or the skin broken anywhere. He says the patient was in a sleepy, stupid, partially comatose condition, and complained very much, "in a rough kind of way;" of pain in his head; that his temperature was normal up to June 22d, when it went up to 101½ degrees; that the next day it was normal again, and so remained to the end, viz., till August 6, 1896, when the doctor says he discharged him as a daily patient, he being in a convalescing condition. He says appellee first complained of pain in his back June 22d; that he was able to get around a little with a crutch and cane toward the end of July. The witness says that June 16, 1896, he found no subjective symptoms except coldness of the extremities, lividity of countenance, partial insensibility and loss of general intelligence, and that, as appellee appeared at the trial, he looked better. Also that, within two weeks prior to the trial, he examined appellee, and that when he pressed on top of his head he jumped, and that he, the witness, found tender spots up and down the spine; that these are not objective symptoms. Upon being asked as to appellee's present condition, he said it was neuresthenia, namely, an enfeebled condition of the nervous system.

Dr. Clevenger, a witness for appellee, testified that he examined appellee October 13, 1897; that he "seemed to be below par nervously, a general neuresthenia." Upon being asked what that meant "in ordinary language," he answered, "Well, the old term for it was debility—general debility—a debilitated condition." Q. "Do you think he will get well, Doctor, from the nervousness?" A. "I would want to have the man under observation for probably a month or so before being able to form an accurate opinion." In answer to a long, involved, hypothetical question, the witness answered: "Taking all the matters detailed into consideration, it would seem improbable that he would get better very much. He seems to have been in a chronic condition now for the past year." The witness further

testified that the prospect of recovery from neuresthenia produced by a blow, or traumatic neuresthenia, is worse than in cases of neuresthenia from other causes; also, that from his examination of appellee, he could not state that his condition was attributable to a blow on the head. We think the evidence falls short of proving a permanent injury, an injury from which there can be no recovery.

Dr. Church testified that the condition of appellee, as described by himself and his witnesses, could not, in his opinion, be produced by a blow on the head, leaving no mark of violence on the scalp, and Dr. St. John testified very positively that it was impossible. No blood or any external mark indicating violence was discovered either at the time of the accident or afterward.

It appears from the evidence that appellee was a laboring man, but there is no evidence as to his earnings. Appellee's attorney, in his closing argument to the jury, told the jury that appellee was a poor man, and said: "It is an imposing array of power that this crowd here of clients and associates presents to you. He can't do it. He has not hundreds of dollars, or $150, or $200, to do all that." On exception taken to these remarks, the court warned appellee's attorney, saying: "I like to try a suit without error if I can, but if error gets into this record by reason of your speech, your client will be the sufferer. * * * I do not propose to have cases tried in a way that is not legal. There is no testimony in this case about his property or wealth." To which appellee's attorney replied: "No, and that must not be considered;" notwithstanding which, the same attorney subsequently addressed to the jury these remarks, referring to appellee: "And this man whom they bring out on the stand, on cross-examination, this man whose possession is a horse and wagon, and the old wagon so ricketty that he had to go around to that poor blacksmith that they tried to slander here." If these remarks were not made and intended to influence the jury to assess larger damages on account of the alleged property of the appellee than they otherwise would, it is difficult to perceive for

what purpose they were made. It is elementary that in such a case as the present, the financial circumstances of the parties is wholly immaterial, and therefore that evidence of it is wholly inadmissible, which being true, the statement by counsel that his client was poor, and his implied statement that the defendants in the action were wealthy, were highly improper, and were well calculated to influence the jury to base their assessment of damages, partially, at least, on these improper considerations. We agree with the trial court, that the sum assessed as damages by the jury was excessive, and are of opinion that the verdict was the result of passion, prejudice, misconception or undue sympathy with appellee, and that, such being the case, the error of the verdict was not cured by the remittitur. In W. C. St. Ry. Co. v. Krueger, 68 Ill. App. 450, counsel for plaintiff made improper remarks, and statements not warranted by the evidence, in his argument to the jury. A verdict was rendered for $50,000, of which sum the plaintiff remitted $15,000, and judgment was rendered for the remainder. Held, that the verdict was excessive, and was the result in some degree of the inflammatory and improper address of counsel, and that the remittitur did not cure the error.

In W. C. St. R. R. Co. v. Johnson, 69 Ill. App. 147, the verdict was for $20,000 damages, $10,000 of which was remitted and judgment rendered for the residue. There was a great deal of disorder during the trial, and frequent interruptions, occasioned by what the court designates "the frequent jangling and quarreling of counsel." The court say: "Finding in the record, as we do, so much evidence of what is prejudicial to a cool and deliberate verdict, we are of opinion that the trial judge ought to have set the entire verdict aside, and our duty is to send the case back for another trial."

The following language of the court in the case last cited is appropriate here: "When a verdict for twenty thousand dollars in a personal injury case is tainted with something which vitiates it to one-half its extent, it is a serious question if its other half may be ripened into a wholesome judg-

ment; whether the vice that contaminated to the extent of one-half did not permeate and invalidate the whole." In C. & E. R. R. Co. v. Binkopski, 72 Ill. App. 22, the verdict was for $15,000, $10,000 of which was remitted and judgment entered. It appeared that improper remarks were made by the plaintiff's attorney, in the hearing of the jury, of a character likely to prejudice the jury against the defendant. Held, that the verdict was the result of prejudice and that the remittitur did not cure it.

In Loewenthal v. Streng, 90 Ill. 74, it was said that when a verdict is so flagrantly excessive as to be only accounted for on the grounds of prejudice, passion or misconception, the remittitur does not remove the prejudice, passion or misconception.

See also C. & N. W. Ry. Co. v. Cummings, 20 Ill. App. 333. Inasmuch as there must be a new trial of the cause, we deem it unnecessary to inquire whether the court erred in refusing to grant a new trial on the ground of newly-discovered evidence, supported by affidavits filed by appellant.

The judgment will be reversed and the cause remanded.