The opinion of the court was delivered by
Monroe, J.
The Ouachita National Bank and Mrs. Elvira Arrant have prosecuted appeals from the judgment of the District Court upon their oppositions to the final account filed by the receivers in this case, and the receivers have answered, praying an amendment of the judgment.
The grounds of opposition are multifarious, and can be be more intelligently considered after a general statement of the case presented by the record.
The Sheets Lumber Company, Limited, was incorporated in 1895, and engaged in business at Monroe, in the parish of Ouachita, where it owned a saw and planing mill plant, together with a residence and certain adjacent land. In May, 1897, upon the application of a creditor, and with the concurrence of other creditors and of the company and its stockholders, John P. Parker and C. A. Downey were appointed receivers, and an inventory was taken of the assets, and filed, together with a schedule of the liabilities, from which it appears that the assets were valued at $61,688.41, and that the liabilities amounted to $48.-784.63.
A few days after their appointment, the receivers obtained an order from the court a qua “to operate or, lease, as appears most profitable, the saw mill plant and planing mill * * * and also to purchase a stock of saw logs”, etc.
They consulted with some of the large creditors, however, and decided not to operate the saw mill, but to confine themselves to operating the planing mill, in so far as to work up, into merchantable condition, a quantity of lumber which formed part of the assets of the company; to disposing of the lumber so prepared, and to putting the plant in order for the purpose of a sale. They proceeded upon the buna *1339 thus- indicated during the months of June, July, and part of August, employing such labor and making such repairs as they thought advisable, operating the planing mill, and selling, at private sale, the lumber prepared by them, as well as that which they found on hand, or purchased to fill orders. In the month of August, they presented a petition to the judge a quo, representing that they had sold nearly all the lumber, but had been unable to find a purchaser for the plant; that the buildings and machinery were deteriorating, and that it would be advisable to sell the entire property at public sale. And, upon August 23, 1897, the judge made an order in the following terms, to-wit:
“ The foregoing application having been fully considered, it is or- “ dered and decreed that the sheriff of the parish of Ouachita proceed “ to sell in the manner of judicial sales under execution, all the prop- “ erty, real and personal, belonging to the Sheets Lumber Company, “ Limited, for the purpose of paying the debts of said corporation. It “ is further ordered that the terms of sale of the real estate shall be “ one-third cash, and the balance in six and twelve months, secured by “ special mortgage, and vendor’s lien upon the property sold; the per- “ sonal property to be sold for cash.”
“It is further ordered that the real estate be sold in two lots; the “ residence with the five acres on which it is situated and' which is now “ mortgaged to the Monroe Loan and Building Association to be sold “ in one lot, separate from the rest of the real estate, and that the saw “ and planing mill be sold in a separate lot from that of the residence “ * * * That said sale be advertised in the Manufacturers’ Record “and Lumbermen’s Journal, in addition to the local newspapers in “ Monroe”, etc.
Under this order, the property was advertised to be sold October 2, 1897, and upon that day, the sheriff offered it — that is to say, he began by offering and selling the residence and the five acres upon which it stands, which were adjudicated to R. B. Blanks for $3050.00.
The remaining real estate, considered with reference to the manner in which it appears upon the inventory, consisted of fifty-eight acres of land appraised at...................:...............$1,994 00 One-fourth interest in 147 acres ...................;. .. . 595 00 Saw mill, machinery, ground, etc.........................19,854 45 Planing mill, machinery, ground, etc....................15,520 00
*1340 Instead of selling this property as one lot, the sheriff appears to -have understood the order under which he was proceeding to be more particularly directed to securing a separate sale of the residence rather than the sale of the rest of the real estate in block; hence, after selling the residence, his idea was to proceed with the sale of the other property in lots as it appeared upon the inventory, and he, accordingly, next offered the fifty-eight acres, which were also adjudicated to R. B. Blanks, for $1425. He then sold a lot, of one hundred gallons of oil; and then, as appears from his return, he “continued to cry, for a reasonable length of time, the remainder of said property, and each piece thereof separately, and there appearing no one who would bid the amount of two-thirds of the appraisement for any piece thereof’'", he declared the sale closed.
The evidence shows that several of the creditors were present at this sale; that one of the counsel, who represents the two opponents now before us, and who, as we understand it, then represented them, was present; and that the judge was within easy access; but that no suggestion was made to the sheriff, or to the judge, that the former was proceeding in a manner not authorized by the order of the latter, or which would prejudice the interests of the creditors. Beyond this, from the testimony given by the judge, himself, it appears that it was his intention, though the language of the order can hardly be said to have expressed it, that the property should be sold as the sheriff sold it, in lots, and not in block.
The attempt to sell upon October 2nd, having resulted as has been stated, the sheriff re-advertised the property, to be sold October 23rd, on a twelve month bond. Upon October 23rd, however, a number of creditors, including the present opponents, presented a petition, setting forth “that the condition of the country, growing out of the excitement of the prevailing epidemic, and the strict quarantine” would be likely to interfere with the attendance of purchasers, and praying that the sale be postponed for thirty days, or until the removal of the quarantine ;and the sale was postponed until December 4th, when the rest of the property was sold to R. B. Blanks,' with the exception of the one-fourth interest in the 147 acres, which was sold to R. B. Blanks and John P. Parker, in indivisión; and the purchasers, preferring to do so, were permitted to pay the amounts of their bids in cash.
The receivers had thus sold all the property which had been entrusted *1341 to them, and had received the price, and there was nothing left for them to do, but file their account.
Why this was not done at once, does not appear. As a matter of fact, the account was not filed until May 28, 1898, nearly six months after the last sale. The account as filed is open to criticism in several particulars, and among others, in that it requires a series of calculations in order to ascertain the amount of money which is admitted to have been received, and which, those calculations having been made, we find to be as follows:
Proceeds of residence ..................................$3,050 00
Proceeds of fifty-eight acres ....:....................... 1,425 00
One-fourth of 147 acres ........."..................... 175 00
100 gallons of oil...................................... 30 00
Other property ........................................ 5,525 00
Logs, lumber, furniture, etc., sold by receivers at private sale ....................... 150 00
Oxen ................................................. 195 00
Wagon ............................................... 100 00
Lumber ............................................... 5,075 45
Collections from accounts .............................. 25 00
Collections from accounts, Exhibit B, made part of account. 287 02
Total...........................................$16,637 47
As against this sum, there are disbursements charged (exclusive of the amount of the mortgage claim of the Building and Loan Association), aggregating $9749.45, and other claims, recognized as privileged, aggregating $4212.11, and still other claims, tentatively placed on the account as entitled to privilege or mortgage, which more than absorb the small balance.
The oppositions which we are to consider attack this account in general, and in particular. It is objected that the public sale, save as to the residence, was not made in conformity with the order of the court, and it is claimed, in argument, that the receivers should be held liable for the appraised value of the property so sold; that the receivers have failed, in some instances, to account for money or property received; that they have credited themselves with the same amounts twice; that they have made disbursements without authority, and to no purpose, *1342 and should not be allowed credit therefor; that the fees with which they credit themselves and their attorneys, are excessive, etc., etc., which objections and claims, we will now consider in detail.
I.
The objection that the property which was sold by the sheriff was not sold'in conformity to the order of the court-would, we think, have been entitled to serious consideration if it had been presented at the proper time and in connection with some prayer for relief which it would be possible to grant. But there are several reasons why the receivers ought not to be held liable for any loss which may have been sustained on that account.
The order for the sale was made by the judge, without suggestion from the receivers, of anyone else; it was directed to the sheriff of the parish of Ouachita, and it was that officer who made the sale, and not the receivers, nor did the receivers suggest the manner in which Nit should be made. The counsel who -now represents the opponents, and who, we understand, represented them then, was present at the sale made October 2nd, when the fifty-eight acres were sold, as a separate lot, and made no protest or objection to the sheriff, nor application to the judge, though the latter was close at hand. Nor, when the sale was suspended for lack of bidders, was any complaint made by the opponents of what had been done. The sheriff was acting under a misconstruction of the language of the order, though, as we have said, from the testimony given by the judge, there was probably no misconstruction of the purpose of the latter in making the order. If the opponents thought there was no authority for the sale of the fifty-eight acres, as a separate lot, and that injury would result to them therefrom, they should have warned the sheriff not to make the sale in that way; they should have made a public announcement of his want of authority to do so; and, if they failed to accomplish their purpose, they should have applied to the judge to prevent the consummation of the sale as about to be made, and to annul what had been done. Instead of doing any of these things, the opponents remained silent until the day before that fixed for the sale on bond, when they, and other creditors, presented the petition, asking that the sale of the balance of the property be postponed on account of the-unfavorable health conditions, quarantine, etc.. *1343 but suggesting- absolutely no objection whatever, either to the sale which had been made, or to that which was to be made. And when the final sale was made, December 4th, 1897, they still remained silent, and only opened their mouths to speak some six months later, when, whilst claiming- the proceeds of the sales as made, they complain that the receivers should be held liable for the results of the misinterpretation, by the sherifli, of the order which the court had directed to him.
In addition to this, there is no evidence in the record which would justify us in assuming- that the property would, if sold in block, have realized more than was obtained for it. There seems to be a good deal of force in the suggestion, that the purchaser of the fifty-eight acres acquired the key to the situation, but, that being the case, it is fair to suppose that one person, intending' to buy the whole plant, would have perceived it as readily as another, and would have regulated his bid upon the “key” accordingly. In other words, if there had been two or more bidders present, anxious to buy the entire plant, and willing to-pay its value, it seems to us probable that the value would have been obtained, whether the property was sold in block or in lots. The real trouble, we think, arose from the fact that it was considered a bad season for persons from elsewhere to be prospecting in Louisiana, and, with the exception of the gentlemen to whom the property was adjudicated, and who were the presidents of the two banks in Monroe, which were large creditors of the Sheets Lumber Company, there appears to have been no one else present able or willing to buy. We, therefore, conclude, that this ground of opposition is without merit.
II.
It appears that the one-fourth interest in the 147 acres, which was appraised at $595.00, was adjudicated to R. B. Blanks and John P. Parker, in indivisión, for $175.00. But Parker is one of the receivers. He ought to have known that he could not buy that, or any other property belonging to the corporation, for which it was his duty to obtain the best price possible, since, as a purchaser, it was to his interest that it should sell for the lowest price, and a man is not permitted to place himself in a position where his duty and his interest thus conflict.
The receiver, Parker, should be held liable for the appraised value of this property. Succession of Stanborough, 37 Ann., 275; Heirs of Wood vs. Nicholls, 33 Ann., 744; McCready & Burke vs. Schenck, 43 Ann., 479; High on Receivers, 3rd Ed., par. 193.
*1344 III.
The evidence shows that the receivers sold lumber at private sale, the aggregate price of which was $6846.67, whereas they charge themselves, on the account filed, with only $5675.43. They arrive at these figures by deducting from the $6846.07, as shown by the books kept bv them, the following amounts, to-wit:
Amount charged R. M. Filhiol, in error...................$ 30 00
Bill of lumber sold Willis Whitaker and not collected........ 266 73
Amount charged to C. A. Downey...............■......... 874 49
$1,171 22
Amount charged on account ............................ 5,675 45
Aggregate price .................................$6,846 67
The receivers were entitled to a credit of $30 by reason of an error in the account of Filhiol, but they have taken that credit elsewhere.
There is no denial of the fact that they sold the bill of lumber to Whittaker and have not collected the money, nor, so far as we have been able to discover, has any particular effort been made to collect it. We are of opinion that they should be held liable for the amount.
The item of $874.49 represents certain lumber taken by Mr. Downey, one of the receivers, for his own account. An effort has been made to show that this lumber was sold, or turned over to him, before his appointment as receiver, but the evidence, in our opinion, establishes affirmatively that lumber to that amount, and probably more, was shipped for his account, and charged to him, after his appointment. This appears, not only from the books kept by the receivers, but is corroborated by the testimony of Sheets, who kept the books; of Handy, the president of the Monroe Grocery Company; and of the bookkeeper, and the books of the Southern Grocer Company, showing the amounts received by it from the Sheets Lumber Company for the account of O. A. Downey. The receivers are, therefore, to be charged with an additional amount of $1171.22 on account of lumber sold at private sale.
IV.
It is admitted that a wagon, not inventoried, came into the possession of the receivers, and was sold by them for $75, to a buyer who is *1345 abundantly able to pay, but that the price has not been collected, or accounted for. "The receivers are to be charged with the amount.
Y.
The receivers credit themselves with an item of $533.30 for “general office and other expenses”, and with another item of $398.07 for “special labor, caring for property, extra work, book-keeping”, etc. The evidence shows that in both of these items there is included $148.77 paid to W. II. Sheets, and these items must be reduced by that amount by reason of the double credit thus taken.
VI.
Our attention is also called to an item of $282.46, said to have been paid for “labor in saw and planing mills,” and placed on the account as privileged. In this item is included $253.16 as the salary of William Grooves, who was employed at $75 per month, for services rendered prior to the appointment of the receivers. The order appointing the receivers was made May 18, 1897. Act 145 of 1888, provides that “all managers, mechanics or laborers, employed or working in saw-mills, planing mills * * * shall have a privilege on all lumber, shingles, and ¿11 other material manufactured, * * * provided that the privilege shall not exist for a longer period of time than thirty days after the maturity of the debt; and provided further that this privilege shall have no effect against • Iona -fide purchasers.” The salary for April matured at the end of the month, and the salary for May, up to the 18th, matured then, by reason of the order appointing the receivers. Aside, therefore, from the question of payments which may have been made on account, Groves was entitled to a privilege for $75.00 for his salary for April, and $45.00 for May, or a total of $125.00. It appears from this account that he received $19.85, April 20th, and $10.86 between that time and May 18th, or a total of $30.71, upon and after the date on which his April salary became due. What he had received before then can hardly be attributed to either the April or May salaries. Deducting $30.71 from $125.00, and the amount for which he is entitled to a'privilege is $94.29. The judge a quo thought it should be $75.00. The receivers in their answer to the appeal have asked that the privilege be allowed for $253.16, as *1346 upon the account. For the reasons stated, we are unable to agree with either, or with the opponents, who claim that there is no privilege at all. -We think a privilege should be recognized as allowed by law, for $94.29, and that the item under consideration should be reduced by the difference between that amount and $253.16, or say $158.57, which latter amount should be ranked as an ordinary claim.
VII.
The receivers have entered upon the credit side of their account, as “Exhibit D,” an item of $2,669.90, made up of what are called “privileged labor claims, unpaid, as reported to receivers and shown by the books of the company.” Included in, and making part, of this item, C. A. Downey appears as the holder of Tabor tickets to the amount of $2,182.25; Julius Kaliske appears as the holder of such tickets to the amount of $50.50; S. P. Bres appears as the holder of such tickets to the amount of $18.75; “Joe Cook, for PI. J. Benoit,” appears as the holder of tickets to the amount of $27.89; and a number of other persons appear as the holders of other tickets.
Considering the claim of Mr. Downey; he is a merchant who sold goods to the employes of the mill, and received, in payment, orders upon the company, which read as follows, to-wit:
“Sheets Lumber Company, Limited, No..... Please pay..........
“ in merchandise, .......................dollars.
“To Mr. C. A. Downey.
“Sheet Lumber Company, Limited,
“Per. W. H. S.”
These drafts were redeemed by the company, from time to' time, in cash, or by shipments of lumber upon Downey’s orders. His account, upon the books of the company, shows á balance due him,'May 18, 1897 (the day upon which Parker was appointed receiver), of $3,056.74. Upon March 31st, the account shows a balance in his favor of $2,789.02. Between March 31st and April 18th, therefore, according to the account, the indebedness had been increased by $267.72. But w.e fail to find that this’increase was made up of orders given by the company to its employees and honored by Mr. Downey, and we do find, upon the other hand, that the amount received by Downey in cash, and *1347 otherwise, between the dates mentioned, exceeded the amount of such orders with which he was credited. Assuming, therefore, for the purposes of the argument, that, as the holder of such orders, given for services rendered by employees, he would be entitled to stand in the shoes ’ of such employees, it appears that all the orders given for serviced rendered within the time during which a privilege can be claimed must be considered as having been paid, since the other credits upon his aceount during that period bear no privilege, and the payments are to be imputed to the debt which the “debtor had, at the time, most interest in discharging.” C. C. 2166.
With regard to the other amounts, which go to make up the item of $2,669.90, we are equally satisfied that none of them are privileged, but that thhy should rank, with the claim of Downey, as ordinary debts.
VIII.
Objection is made to' the item “repairs to and operating saw-mill, $390.33, with which the receivers credit themselves. It is admitted that the saw-mill was not operated, and the receivers have produced no vouchers for money expended in repairs; nor do we find anything in the order of court, under which they were acting, which authorized them to incur such expense. The disbursement, if made for repairs which enhanced the selling value of the property, might be approved, as having enured to the benefit of the creditors. But the attempt to show that this was the case must be considered a failure, when we find that the property, appraised at nearly $40,000.00, was sold for less than $6,000.00. This credit, we think, should not be allowed.
IX.
The receivers credit themselves with fees amounting, in the aggregate, to $2,700.00, or $1,350.00 each,, and the amount claimed was allowed to Mr. Downey, whilst, as to Mr. Parker, it was reduced to $600.00.
Upon this subject, it is said by Mr. High, that: “In this country, as in England, no established rule has been fixed for determining the amount of compensation to be allowed receivers, and*it is, from the nature of the case, quite impracticable to establish an inflexible rule. The compensation is, therefore, usually determined according to the *1348 circumstances of the particular case, rather than by any fixed principles or established rate of percentage. It may be said, in general terms, that a rerceiver’s compensation should correspond with the degree of business capacity, integrity and responsibility required in the management of the affairs entrusted to him,” etc.
High on Receivers, 3rd Ed., Sec. 783.
In Grant vs. Bryant, 101 Mass., 567, it was said:
“The court does not regulate the compensation of its ‘officers upon the basis of a fixfed commission upon the amount of money passing through their hands, but allow them such an amount as would be reasonable for the services required of and rendered by a person of ordinary ability, and competent for such duties and services.”
There can be no question but that the administration of the receivers in this case has been disastrous in the extreme; and, whilst they aré not altogether to blame for the results, iwhereby property- appraised (using round figures) at $61,000.00 has realized but $16,000.00, out of which over $10,000.00 is charged for fees, costs and expenses, they are by no means beyond criticism.
Their services extended over a period of about six and a half months, say from May 18th, to December 4th, 1897, at which latter date the last of the property under administration was sold; and, during that period, the person actually in charge of the practical details of the business, and who, during most of the time, had entire charge of the books, was W. H. .Sheets, who had held the same position, relatively speaking, before the receivers were appointed. This gentleman seems to have been much deferred to in all matters, and if either of the receivers lorew anything about the lumber business, they failed to give their administration the benefit of that knowledge. This may be illustrated by the answer given by Mr. Parker to the question, whether, in selling lumber at private sale, the receivers did not undersell some other company, to which he replied: “I do not know. The price was left entirely to Mr. Sheets. Every offer or every order that we received we referred to him before making the price.” Mr. Parker does not pretend to have given much of his time or attention to the business, and testifies that, when spoken to upon the subject, he referred to Mr. Downey and Mr. Sheets. And Mr. Downey, like Mr. Parker, left the active management of the business to Mr. Sheets, knew nothing about book-keeping, and rarely looked into the books.
*1349 Beyond this, these gentlemen seemed to have been laboring under a total misconception of the duties and obligations which they had assumed, and of their relations, as receivers!, and as individuals, to those whose interests they had taken in charge.
We have already had occasion to notice the fact that Mr. Parker was the adjudicatee of certain real estate which formed part of the property entrusted to him and to his co-receivers. But that was merely one circumstance among many of a similar character. The general course of business was exactly as though Parker and Downey, receivers, were totally distinct persons from Parker and Downey, individuals; and as though they were at' perfect liberty, in the one capacity, to buy from and sell to themselves, in the other capacity.
Mr. Parker, therefore, not only bought lumber from the receivers, but sold lumber to them. And Mr. Downey continued the same relations with the receivers which he had previously maintained with the Sheets Lumber Company; that is to say, the employes of the receivers were paid, wholly, or in part, by orders on Mr. Downey, which were taken out in merchandise furnished from the store which Mr. Downey continued to operate. As the receivers assumed, without any application to the court upon the subject, after the obtention of the first order, to employ as many persons as they pleased, and to fix their salaries, and, as it is to be supposed that Mr. Downey made a profit on the merchandise furnished by him as a merchant, upon the orders given by him, as receiver, the glaring impropriety of the position in which he and his co-receiver placed themselves, must have been manifest to any one who was not grossly ignorant of, or wilfully blind to, the duties and obligations of persons acting as fiduciaries.
Beyond this, we think it appears from the record that both money and property which went into the hands of the receivers as assets of the Sheets Lumber Company were paid or used in satisfaction, or in part satisfaction, of a debt due to Mr. Downey, before the receivers were appointed. The statement of the Southern Grocer Company is in evidence, supported by the testimony of Mr. Newhall, the book-keeper of that concern, and it shows that $615.92 worth of lumber was turned over to it for Downey’s account, June 9, 1897. It also appears in the record that Mr. Downey received by checks, by the collection of bills," due either to the receivers, or to the Lumber Company; and in cash, between October 18th, 1897, and January 21st, 1898, inclusive, *1350 $526.13, and Ms explanation, when interrogated upon the subject, to the effect, in a general way, that he must have received these amounts for something due him at the time, is unsatisfactory. One of the checks appears to have been for $346.66, and to have been given January 21st, 1898. From the evidence, we understand that the handwriting upon the stub, and in the body of the check, was Mr. Downey’s; and, 'though he says that it was signed by Mr. Parker, he does not deny that he got the money on it, and yet he fails to explain why it was paid to him, except to say that it was a balance due him by the receivers.
These circumstances tend to show, to say the least of it, a lack of appreciation, by the receivers, of thel obligations of their position; and, as there is nothing in the administration of the business to indicate that they possessed any peculiar qualifications in that direction, we should be disposed to allow them nothing, were it not that the, oppositions, and the brief filed in support thereof, concede that some allowance should be made. We, therefore, fix the amount to be allowed both receivers at $500.00.
X.
The Building and Loan Association, in whose interest the residence property was sold, separately, was represented by Mr. F. G. Hudson, one of the counsel who represents the receivers; and, included in the mortgage claim of said association, is an item for attorney’s fees, which the receivers have recognized, amounting to $252.46, to which the opponents object. The only counsel who represented the Building Association were, at the s£.me time, representing the receivers. As attorneys for the receivers, they prepared the petition asking for the sale of the mortgaged property, separately from the rest, in order to secure the payment of the mortgage debt, and the sale was so made. We do not think that a separate fee should be allowed one of them as attorney for the association, or should be allowed the association by which he was employed.
XL
From the receivers’ account, it appears that they paid to Mr. F. G. Hudson, their attorney, for services rendered, $600.00, and there is further entry as follows, to-wit:
*1351 “F. G. Hudson, attorney’s fees, 2 1-2 per cent, of the amount of the “ inventory. This includes all professional services rendered receivers “in both State and United States courts, consultations, and advice “from time to time; all suits brought by or against the receiver, and “ this account — $1,542.21.”
It is explained in the testimony that the amount thus claimed includes the $600 already paid, and also includes any fee which may be due to the counsel associated with Mr. Hudson. The amount in question is predicated, as appears from the entry, upon a percentage of the appraisement, as per the inventory. A good deal of the time of the learned counsel and of that of his clients was, however, devoted to an effort to show that the appraisement was too high, and we are convinced that, in some respects, it was. Thus, from the accounts appraised at $4,414.96, the receivers collected $287,02. And for the lumber and logs appraised at $10,200.00, they obtained about half that amount, and it is claimed that this particular property realized something like an approximation to its value. Under these circumstances, and in view of the general disaster, we think that $1,200.00 is as much as should be allowed for counsel’s fees.
We concur with the judge a quo that the judgment in favor of the Ouachita National Rank, rendered without citation, and upon a confession made in the name of the Lumber Company, without authority, is an absolute nullity. And, in other respects, save as hereinbefore indicated, we find his judgment correct. It will, therefore, be amended in certain particulars, and, as amended, affirmed.
It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended so as to direct the amendment of the account filed by the receivers in the following additional particulars, viz:
By increasing the total amount which,, upon the face of the account, appears to have come into the hands of the receivers, to-wit: the sum of $16,637.47 by;
1. The sum of $420.00, to be paid by John P. Parker, individually; being the difference between the appraised value of real estate adjudicated to him and the price at which it was so adjudicated.
2. The sum of $1,171.22; being the difference between $6,846.67, the aggregate price of lumber sold by the receivers at private sale, and $5,675.45 the amount accounted for.
*1352 By reducing, amending, and rejecting the credit items on said account as follows, to-wit:
3. By disallowing the privilege recognized in favor of the claims included in “Exhibit D,” amounting to $2,669.90.
4. By rejecting the item, “repairs to, and operating saw-mill, $390.30.”
5. By reducing the fees to be allowéd the receivers to $500.00, said amount to be equally divided between them.
6. By rejecting and disallowing the item, “attorney’s fees on same, per terms of mortgage, $252.46.”
7. By reducing the fees to be allowed the attorneys of the receivers to $1,200.00, said amount to include all payments made, and all counsel employed.
8. By increasing the amount, for which a privilege is allowed, in favor of William Groves from $75.00 to' $94.29.
It is further ordered, adjudged and decreed that, in all other respects, said judgment be affirmed, and that the account as thus amended, be approved and homologated and the funds distributed accordingly, the costs to be borne by the mass.
Blanchard, J., takes no part in this decision.
Rehearing refused.