NOWELL et al. v. INTERNATIONAL TRUST CO. et al. (GILLESPIE, et al., Interveners).

(Circuit Court of Appeals, Ninth Circuit. April 5, 1909.)

No. 1,641.

1. RECEIVERS (§ 21*)—SUIT AGAINST CORPORATION—RIGHT TO APPOINTMENT OF RECEIVER.

A complaint in an action by a simple contract creditor for a few hundred dollars against mining companies, owning large properties and having a mortgage indebtedness of $500,000, which did not allege the insolvency of defendants, but only that their recent operations had not been profitable, that creditors were threatening suits, and that their assets if sold at forced sale would not pay their indebtedness, did not present a case which entitled plaintiff to the appointment of a receiver.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 29; Dec. Dig. § 21.*]

2. RECEIVERS (§ 196*)—COMPENSATION FOR SERVICES—RIGHT TO ALLOWANCE.

Where a receiver has unnecessarily prolonged a receivership, when justice required that he be discharged and the receivership ended, or where a receiver has been guilty of misconduct in the management of the property committed to his charge, the court may, if the circumstances warrant, deny him compensation.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 387; Dec. Dig. § 196.*]

3. RECEIVERS (§ 128*)—RECEIVERS' CERTIFICATES—LIEN AND PRIORITIES.

In a suit by a small creditor against four mining corporations in Alaska, all of whose property was subject to a mortgage executed to a trustee in Boston to secure an issue of $500,000 of bonds which had been sold in the open market, a receiver was appointed who was subsequently succeeded by a second receiver. The latter before his appointment, acting on behalf of the defendants, had paid off the complainant's claim in full. He had also been furnished with money to pay off all of the defendant's indebtedness, except the mortgage debt, but instead of doing so used the money in carrying on their business and developing their property, and in addition on leave of court, granted on his application and without notice to the mortgagee or bondholders, who were not parties, he issued receivers' certificates from time to time to the amount of over $200,000, the proceeds of which were used for the same purpose. He continued the business for nearly eight years at a financial loss, when the mortgage trustee was made a party, and also commenced an independent suit to foreclose. Held, that as there was no controversy before the court which warranted the appointment of such receiver, or his continuance in service, the expense of his administration, if allowed at all, was chargeable to defendants only, subject to the receivers' certificates, and that neither could be given priority as liens over the mortgage in the absence of tangible and certain proof of assent or estoppel on the part of the trustee or bondholders.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 128.*

Nature of certificates, see note to Postal Tel. Cable Co. v. Vane, 26 C. C. A. 350.]

4. CORPORATIONS (§ 482*)—FORECLOSURE OF MORTGAGE—BRINGING IN NEW PARTIES.

Where the pleadings in a suit by a mortgage trustee to foreclose a corporation mortgage securing bonds, including a cross-bill and petitions of intervention, presented the issue generally as to the right of priority between the mortgage and receiver's certificates; but no issue as to any individual bondholder, it was not the duty of the court to require any bond-

holder to be made a party, nor an abuse of discretion to refuse to open the decree two months after its entry to permit such parties to be brought in and new issues joined and litigated.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 482.*]

5. APPEAL AND ERROR (§ 873*) — REVIEW — ON APPEAL FROM FINAL DECREE — SUBSEQUENT ORDERS.

Where an appeal is from the final decree only, an order subsequently made denying a motion to set the decree aside cannot be reviewed by the appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3460, 3522; Dec. Dig. § 873.*]

Appeal from the District Court of the United States for the First Division of the District of Alaska.

On July 1, 1896, the Berners Bay Mining & Milling Company executed its mortgage to the International Trust Company to secure the payment of 500 bonds, each for the sum of $1,000. The property mortgaged consisted of mining claims patented and unpatented, mill sites, and other property situate in the Harris mining district, Alaska. In September, 1897, the stockholders of that corporation organized the Ophir Gold Mining Company, the Seward Gold Mining Company, and the Northern Belle Gold Mining Company, and distributed the property of the original company among the three new companies, in consideration of which the latter assumed the bonded indebtedness of the former. On December 15, 1897, Decker Bros. instituted a suit against all of these four corporations, and alleged in their complaint an indebtedness from the defendant corporations to the plaintiffs therein of $154.65 for goods sold and delivered. They further alleged that the plaintiffs had outstanding checks of the defendants which they had cashed, and which would be protested for nonpayment; that the defendants were indebted to others in the sum of $500,000, which they were unable to pay; that their assets were insufficient, if sold at forced sale, to pay their debts, and that a large number of creditors were threatening suits, whereby the assets would be wasted. The complaint prayed for the appointment of a receiver to take charge of the property and business of the defendants, and out of the same to pay their debts. On the day on which that complaint was filed, E. F. Cassel was appointed receiver. Two weeks later he filed a petition setting forth that large sums were due employés of the defendants for work and labor in developing their mines, and asking that the same be adjudged preferred claims, and that he be authorized to pay them, and that he be authorized to operate the plant. On the same day the petition was allowed. On February 7, 1898, a number of the creditors of the defendant companies joined in a petition to the court to dissolve and set aside the appointment of E. S. Cassel as receiver and restore the property to its owners, and, in case the receivership could not be set aside, that F. D. Nowell be appointed receiver. Among the signatures to the petition is found the following: Bondholders, Eastern creditors as per telegram, and F. D., W. E., and Nowell Bros., $332,500. The telegram is not in the record, nor is there any signature of any one claiming to represent the bondholders and Eastern creditors. Petitions of William Endicott, Henry Endicott, Aaron Hobart, Wallace Hackett, and C. H. Sawyer joining in the request are found in the record, but they bear no file mark, and it is admitted that they never were filed. The attorney for the defendant companies testified, however, that, although they were not filed, they were submitted to the judge. On February 12, 1898, Frederick D. Nowell was appointed receiver. From that date until December 9, 1905, about eight years after the commencement of the suit, there were no further pleadings between the parties to the suit, but a number of receiver's reports and petitions were filed, and ex parte orders were made. On December 9, 1905, the Berners Bay Mining & Milling Company answered the complaint of Decker Bros., alleging that the indebtedness to Decker Bros. had been fully paid and discharged; that the mortgage of the company to the International Trust Company was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

unpaid, and that the bonds had been sold in the open market and were outstanding debts of the corporations; that the Ophir, the Seward, and the Northern Belle Mining Companies purchased a portion of the properties covered by the operation of the mortgage and subject to the mortgage; that the receiver, acting at the instance of the holders of said bonds, had obtained orders of the court under which he had borrowed large sums of money on receiver's certificates, and otherwise incurred indebtedness in the administration of the property and the operation of the same, which indebtedness, "under the orders of the court authorizing the same and in equity, is a primary lien against said properties for the payment of the same superior and prior to the bonded indebtedness." The answer prayed that the International Trust Company, one of the appellees here, be made a party defendant to the suit, and that the properties mortgaged be decreed to be sold for the payment of said indebtedness according to the rank and priority of the respective claims. On December 11, 1905, the court ordered that the International Trust Company be made a party to the suit. On March 5, 1906, the trust company answered admitting that the claim of Decker Bros. had been paid in full, denying the priority of the receiver's indebtedness, and alleging that at no time had the mortgagee consented to or acquiesced in or approved or ratified any action of the receiver in borrowing money or incurring such indebtedness, and set up the mortgage, which was a deed of trust, and prayed that the same be adjudged a valid and subsisting first lien on the properties. The trust company, being of the opinion that the court had lost jurisdiction of the proceedings in the Decker Bros.' suit upon the payment of their claim in full, sought and obtained leave to commence an independent suit for the foreclosure of its mortgage as a prior lien, and on March 13, 1906, commenced such suit. On April 11, 1907, the court ordered that the two suits be consolidated. To this consolidated cause there were added as parties defendant Thomas S. Nowell, Willis E. Nowell, Frederick D. Nowell, Frederick D. Nowell as receiver, the Nowell Mining & Milling Company, and the Alaska Nowell Gold Mining Company. On March 13, 1906, an order of sale was entered upon the application of the receiver, F. D. Nowell, and the defendant companies, acting through Thomas S. Nowell, the father of the receiver. From that order an appeal was taken to this court, and thereupon the order was reversed. International Trust Co. v. Decker Bros., 152 Fed. 78, 81 C. C. A. 302, 11 L. R. A. (N. S.) 152. On September 27, 1906, upon the application of the trust company, F. D. Nowell was removed as receiver, the order reciting that the trust company would contest any finding as to the honest administration of the receivership of F. D. Nowell. On October 2, 1906, John C. McBride was appointed receiver. On April 11, 1907, the said receiver filed his answer to the pleadings of the trust company, raising the issue as to the priority of the mortgage lien over that of the receiver's certificates and his claim to compensation. The issue so raised is the same as that of the defendant companies, and is substantially that the bondholders, with the knowledge and consent of the trust company, induced the receiver to petition the court for leave to borrow on receiver's certificates, etc., and that the bondholders purchased a large amount of such certificates, and in all respects ratified, confirmed, and acquiesced in said orders. On April 11, 1907, George M. Nowell and Gilmer Clapp, appellants herein, having intervened by leave of the court, as holders of receiver's certificates, filed an amended petition of intervention. They alleged that they were the owners of certificates known as the "third issue," amounting to $33,627.24, and of certain certificates of the second issue, $9,648, and owners of certificates of the first issue, amounting to $18,178, and that they were owners by assignment from F. D. Nowell of the latter's claim for salary and services of $48,511.49, of the claim of J. H. Cobb for services as attorney for Nowell as receiver, $4,500, of the claim of Willis E. Nowell for services in the sum of $3,000, and other claims of receiver's expenses amounting to $2,059.65; that, with the knowledge, consent, and assistance of the bondholders, the receiver had issued and marketed such certificates, and that on or about June 13, 1904, Wallace Hackett executed and delivered a consent and ratification on behalf of all the bondholders, waiving all objection to the orders of the court theretofore made authorizing the issuance of receiver's certificates. They prayed that the expenses of the receiver and the administration of the

receivership be declared a first lien upon the property, and that the indebtedness of the receiver in borrowing money for the purpose of developing and improving the property be declared a second lien, and that thereafter the bonds be paid. The cause went to trial on April 11, 1907. On April 27th, the court filed an opinion on the merits of the controversy, and on July 2d filed findings of fact and of law, and a decree thereupon was entered.

Among the findings of fact made by the trial court are the following: That the bonds described in the mortgage deed of trust were issued and sold in the open market for the benefit of the Berners Bay Mining & Milling Company, which company received the proceeds thereof; that on February 11, 1898, Frederick D. Nowell, for and on behalf of the defendants in the action brought by the Decker Bros., paid the Decker Bros.' claim in full; that upon the appointment of said Frederick D. Nowell as receiver he took charge of the property of the four corporations and commenced mining operations thereon, and the development and exploitation thereof, and that all of his operation of said property was, is, and has been at all times a financial failure, and that said properties were at all times operated at a loss, and that the applications of said Frederick D. Nowell, as receiver, for leave to issue receiver's certificates, were for the purpose of enabling him as such receiver to continue the business of mining, developing, and prospecting undeveloped veins on said properties; that leave for the issuance of all of said receiver's certificates was given upon ex parte applications of said receiver, and without any notice to, or appearance in court by, the International Trust Company or any other parties in interest; that all such receiver's certificates issued prior to October 29, 1901, were absorbed, retired, and canceled by the issuance of the certificates designated in the record as the "first issue certificates," issued on October 29, 1901, to the amount of $190,000; that prior to that date, and prior to the creation or existence of any of the debts now represented by receiver's certificates, Thomas S. Nowell, the original organizer of the Berners Bay Mining & Milling Company, and president thereof, collected from sources not disclosed by the evidence a sufficient sum of money to pay all the indebtedness of the four corporations, excepting the mortgage debt of July 1, 1896, and transmitted the same to said receiver at Juneau with instructions to pay off all the indebtedness against said corporations; that said Frederick D. Nowell, receiver, instead of so applying said money, entered into an agreement with the then unpaid creditors of the said corporations at Juneau, whereby it was agreed that he should use the funds so received, and apply the same to the continuation of the receivership and the operation and development of said mining claims; that on October 29, 1901, said receiver was authorized by an order of court to borrow $190,000, and to issue receiver's certificates therefor to pay the present indebtedness of the receiver, and to make up any temporary deficiency that might arise in developing and operating the Kensington mine and mill over the gross earnings from such operation; and the order provided: "That said certificates be and are a first lien upon the mines, mining claims, mill, water rights, railroad and properties of every kind and description of said companies now under control of the court, and shall be prior to and paramount to any and all mortgages, trust deeds, and indebtedness whatsoever existing against said companies;" that the order further provided for the payment and retirement of all previous issues of receiver's certificates, and the same were also paid and retired; that all of said certificates are outstanding and unpaid, and are known and designated in the record as the "first issue of certificates"; that said order was procured upon the application of the receiver ex parte, without notice to the International Trust Company or any other parties interested in said property; that on November 21, 1902, the proceeds of the first issue of certificates having been exhausted, the receiver applied for authority to issue additional certificates for $60,000, for the purpose of aiding development work on the mining properties in his charge, and an order was made authorizing the issuance of certificates as applied for, and providing that they should be a first lien on the properties, paramount to the mortgage indebtedness, and that they should be equal in right to the first issue of certificates; that $34,173.59 of said issue of certificates are outstanding and unpaid; that the order was obtained by the receiver ex parte, and without notice to or appearance by the

trust company or any other parties interested; that on May 13, 1904, F. D. Nowell, as attorney in fact for the companies defendant in the action, and as receiver, entered into a contract with one Joseph McDonald, giving him an option to purchase the mining properties, which contract provided that McDonald should do certain work in the mines for the actual cost of which the receiver was to issue him certificates, and that, if McDonald should elect to purchase the properties, he should pay (1) all of the indebtedness of the receiver F. D. Nowell, (2) the sum of $50,000 to F. D. Nowell personally, and (3) that he should erect a plant upon the properties of a certain specified capacity, whereupon he should be entitled to a 56/100 interest in a corporation then to be organized to hold all of the said mining properties. On the same day the court entered an order approving the contract, which order was procured ex parte and without notice to or appearance by the trust company or any other party in interest; that McDonald entered upon the prosecution of the contract, but failed to do all the work which he had agreed to do; that, in aid of the performance of the contract, the holders of 498 of the bonds under the mortgage deed of trust deposited their bonds with the trust company, and gave security for the two remaining bonds undeposited, and at their request the trust company placed in escrow with the First National Bank of Juneau a release of the mortgage, with instructions to deliver the same only upon the purchase of the properties by McDonald in accordance with his contract; that on January 1, 1905, McDonald refused to purchase the properties and surrendered his option, and the release of the mortgage was returned to the trust company and was canceled, and the bonds were returned to the owners thereof; that on February 26, 1903, an agreement was made between Wallace Hackett of Portsmouth, N. H., as trustee, Thomas S. Nowell and Frederick D. Nowell and Willis E. Nowell, his sons, which began as follows: "Memoranda of an agreement entered into between the holders of first mortgage bonds of the Berners Bay Mining & Milling Company, organized under the laws of the state of Maine, herein designated as party of the first part, and Wallace Hackett of Portsmouth, New Hampshire, trustee, herein designated as party of the second part, Thomas S. Nowell, Frederick D. Nowell and Willis E. Nowell, all of Juneau, Alaska, parties hereto of the third part;" that the agreement recites that the Berners Bay Mining & Milling Company is subject to a mortgage of $500,000, on which interest is in default; that the property is now in the care and custody of a receiver; that the receiver has issued receiver's certificates from time to time, which aggregate more than $200,000; that there is unsecured indebtedness of the corporation, and that it is for the best interests of all creditors to dispose of their rights and claims to outside parties for a consideration, and that whereas the Nowells, the parties of the third part, have entered into negotiations with certain parties with this end in view, it was therefore agreed: First, that the bondholders should deposit their bonds with Wallace Hackett, the trustee, who would issue his receipts therefor, the acceptance whereof by the bondholders should be considered assent to the contract; that, second, the parties of the third part should provide for the prompt payment of the receiver's certificates or indebtedness and interest, and obtain the discharge of the corporation from the receivership; that, third, the parties of the third part should preserve the integrity of the property, and allow none thereof to be separated or estranged from the main body of the corporation, and that the said properties, together with a group of mines contiguous thereto, known as the "Johnson group," belonging to the party of the third part, should be added to the properties of the Berners Bay Company; that, fourth, a new corporation should be formed and all the properties conveyed to it; that, fifth, of the stock of such new corporation, the parties of the third part should receive 50 per cent., of which one-half was to be placed in the hands of the party of the second part, as trustee for the benefit of the creditors of the Berners Bay Company; that, after all such payments had been made by the parties of the third part, they were to issue, on or about December 31, 1910, to the bondholders pro rata for their holdings 10 per cent. of 50 per cent. of the entire capital stock, and that the trustee was to hold said 25 per cent. of the capital stock of the corporation as collateral security for the payment of the bonds and other indebtedness; that on payment of all the indebtedness the

remaining portion of said 25 per cent. of the capital stock should become the property of the parties of the third part; that, sixth, the trustee was vested with full authority to proceed with the foreclosure of the mortgage if such step should prove necessary. On June 13, 1904, Wallace Hackett received from F. D. Nowell a paper prepared at Juneau by his attorneys, which recites as follows: "Whereas the holders of the bonds of the defendant companies in the above suit, viz.: the Berners Bay Mining & Milling Company, the Northern Belle Mining Company, the Seward Gold Mining Company, and the Ophir Gold Mining Company did consent to the issuance of the receiver's certificates in this cause, and the orders of the court allowing and giving such certificates priority over the mortgage bonds of said companies, but such consent never formally entered of record herein: Now, for the purpose of making such consent a matter of record, I, Wallace Hackett for myself and as trustee and holder of said bonds shown in the list hereto attached, do hereby consent to and waive any and all objections to the orders of the court herein authorizing said certificates and future issues thereof, and giving the same priority over said bonds;" that on the receipt of this paper, on June 13, 1904, Wallace Hackett, without advising the bondholders who had deposited their bonds with him as trustee, and without any other further or other authority than that contained in the contract of February 26, 1903, signed the same and returned it to Frederick D. Nowell, together with the following statement: "In the matter of the bonds of the Berners Bay Mining & Milling Company deposited with the undersigned trustee, I will state that the entire issue of bonds amounted to $500,000, consisting of 500 bonds of the face value of $1,000, each numbered from 1 to 500 inclusive, issued under a mortgage to the International Trust Company of Boston. That owing to the peculiar situation of the property, the bonds being widely scattered, the interest on the bonds having been defaulted, the property in Alaska having passed into the hands of a receiver appointed under authority of the U. S. Court, and receiver's certificates of more than $200,000 having issued, all of which placed the bonds in great jeopardy. Acting under the request of the holders of a majority of the bonds, I addressed to all of the bondholders a letter setting forth the above facts in February, 1903, asking their consent to represent them in negotiations looking to a sale of the property, whereby there was a chance of the bonds being paid, etc., and asking for full authority in the premises, stating in the letter that by depositing their bonds with me, they would assent to the terms of the letter and the contract existing between myself and the other owners of the property under which we sought to liquidate the sale. In response to this letter I received on deposit 498 of the 500 bonds issued. Every bond whose existence we could trace was deposited with me. Two bonds having been lost, #406 and 407, for these I deposited security with the International Trust Company, and that company then issued a release of the mortgage at my request." [Then follows the list of the owners of the bonds, and the amounts held by them]. That neither the said McDonald nor any of the persons who purchased or received such receiver's certificates of the first, second, and third issues, as in the findings of fact described, purchased or received any of the said certificates, nor were they induced to purchase or receive any thereof in reliance upon any act or acts of the International Trust Company or the bondholders under the said mortgage deed of trust, or of the said Wallace Hackett, but all of such certificates were issued and sold and received by the holders thereof with full notice and knowledge of the existence of the said mortgage deed of trust of July 1, 1896, and with notice and knowledge that the same had not been canceled or released or paid.

The conclusions of law were that from February 11, 1908, until the appearance of the International Trust Company in the litigation on March 5, 1906, there was no valid and subsisting cause of action before the court, and that the court had no jurisdiction to hear, try, or determine any matter in said cause or to authorize the issuance of any receiver's certificates, and that all receiver's certificates and indebtedness incurred prior to the last-named date are invalid, except as to the corporations defendant in the suit which was brought by the Decker Bros.; that there was due and owing on the mortgage $881,716, and that the mortgage was a prior, valid, and subsisting lien on the whole property in the hands of the receiver, and that the property be

sold and the proceeds applied: First, to the payment of the costs and expenses of the sale; second, to the payment of the account of J. C. McBride, receiver, and to the accounts of F. D. Nowell incurred after the appearance of the trust company, and to the accounts of the special master, the total whereof was $11,429.36; third, to the payment of the principal and interest due on the mortgage; fourth, to the payment of the receiver's certificates of the first issue, $190,000, with interest; fifth, to the payment of the receiver's certificates of the second issue, $34,173.59 with interest; sixth, to the payment of the receiver's certificates of the third issue, $33,627.24 with interest; and, seventh, to the payment of the claim of F. D. Nowell, receiver, for compensation and expenses not theretofore allowed. In accordance with the findings of fact and conclusions of law, a decree was entered. From the decree the appeal is taken by George M. Nowell and Gilmer Clapp, as assignees of $18,178 of the first issue of certificates, of $9,648 of the second issue, and of $33,627 of the third issue of certificates, and as assignees of the claim of F. D. Nowell, receiver, for compensation and disbursements from the time of his appointment on February 12, 1898, to February 21, 1906, amounting to $71,793.58.

George M. Nowell and Malony & Cobb, for appellants.

Winn & Burton, for appellees Gillespie and others.

L. P. Shackleford, T. R. Lyons, John J. Boyce, E. S. Pillsbury, and Alfred Sutro, for appellee International Trust Co.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The questions involved on the appeal are: First, did the court err in postponing the payment of the compensation and disbursements of the receiver from February 12, 1898, to February 21, 1906, to the lien of the mortgage indebtedness, and to the payment of the receiver's certificates? Second, did the court err in postponing the payment of the receiver's certificates to the lien of the mortgage indebtedness? And, third, did the court err in denying the motion of the appellants Nowell and Clapp to set aside the decree and reopen the litigation for the purpose of making certain specified bondholders parties to the suit?

We find no difficulty in the way of sustaining the conclusion of law which is reached by the court below—that the complaint in the suit of Decker Bros. presented no case for the appointment of a receiver. The plaintiffs in that action were simple contract creditors of the Berners Bay Mining & Milling Company. The purpose of the suit was to obtain the payment of a money demand of $154.65 for goods sold and delivered, and to protect the plaintiffs against liability on certain checks or drafts. The property of the defendants in the suit did not constitute a special fund to which the plaintiffs had the right to resort. The complaint contained no allegation that the defendants were insolvent, or that their property was in danger of loss from mismanagement. The only allegations it contained by the way of showing the propriety of the appointment of a receiver were that the output of the mines for the six months prior to the commencement of the suit was insufficient to meet current expenses, that creditors were threatening suit, that the property of the defendant companies was in danger of being wasted and exhausted, that they were in danger of becoming insolvent, and that if their property was sold

at forced sale there would not be realized a sum sufficient to pay their indebtedness. Not only was the showing so made in the complaint insufficient to authorize the appointment of a receiver in the first instance, but at the time when F. D. Nowell was substituted as receiver the claims of Decker Bros. had been paid in full, and Nowell himself had made the payments. There was then no controversy between the parties to the suit. It was the plain duty of the receiver to report to the court the fact that Decker Bros. had been paid in full, and to obtain the dismissal of the suit and his own discharge as receiver. During the whole of the time from his appointment as receiver until the appearance of the International Trust Company in the suit, a period of nearly eight years, there was no controversy before the court. If the corporations defendant to that suit chose to submit to the situation and to conduct their mining operations all those years through the medium of a receiver, they should be held responsible for the expenses of the receivership. There is no ground in equity for charging those expenses to the mortgagee, or making them paramount to the mortgage lien, or to the expenses represented by the receiver's certificates. Not only was the claim of Decker Bros. paid, but at the time when F. D. Nowell was appointed receiver he had in his hands money sufficient to pay all the debts of the corporations except the mortgage debt, money which had been furnished him expressly for that purpose. By a collusive arrangement with his brother and other relatives, the money was diverted from the purpose for which it was furnished and was devoted to the exploitation of the mines. The operations of the receiver were financially unsuccessful. He incurred debts for which receiver's certificates were issued, and are outstanding, to the amount of $228,700, exclusive of interest. He refused to bring a suit to acquire for the corporations whose property he controlled the group of mines known as the "Johnson group," and thereby aided his father, Thomas S. Nowell, to withhold from the corporations valuable mining claims, which, as this court has held in the case of Nowell et al. v. McBride, Receiver (C. C. A.) 162 Fed. 432, were in equity the property of the defendant corporations. Again, there were irregularities in the issuance of certain of the receiver's certificates such as to invite the severest criticism. One among several of such certificates was that issued to Wallace Hackett for $5,500. It is not denied that this was issued, not for the benefit of Hackett, but for Thomas S. Nowell, to whom it was indorsed by Hackett. It was issued to repay Thomas S. Nowell his expenses incurred in assisting the receiver to secure moneys for his use and in the promotion of plans for the reorganization of the companies. On March 26, 1903, Judge Brown, then the judge of the lower court, denied Thomas S. Nowell's petition for an order that the receiver issue a certificate in recognition of the claim. According to the testimony of F. D. Nowell, Judge Brown subsequently verbally gave him authority to issue the certificate. There is no such order in the record. There can be no question that the claim was not a proper charge upon the properties in the hands of the receiver, as the receiver must have known. In addition to this, the receiver unlawfully issued a number of certificates to himself and to his brother

for debts of the Berners Bay Company incurred prior to the commencement of the action in which the receiver was appointed. In short, the whole of the management of the properties by F. D. Nowell as receiver appears to have been for speculative purposes, and a large majority of the certificates issued by him were for the expense of exploration and development of the mining properties, evidently in the hope of making rich discoveries, in which event the Nowells and the corporations defendant would profit, and with the understanding that in case of failure to make such discoveries the expenses would be charged to the properties, to the postponement and possibly the exclusion of the mortgage bonds.

Where a receiver has unnecessarily prolonged a receivership when justice required that he be discharged and the receivership ended, or where a receiver has been guilty of misconduct in the management of the property committed to his charge, the court may, if the circumstances warrant, deny him compensation. Forrester & MacGinnis v. B. & M. Co., 30 Mont. 181, 76 Pac. 2; Receivership Sheets Lumber Co., 52 La. Ann. 1337, 27 South. 809; McAnrow v. Martin, 183 Ill. 467, 56 N. E. 168; Harrison v. Boydell, 6 Sim. 211; Willis v. Sharp, 58 Hun, 608, 12 N. Y. Supp. 120; High on Receivers (2d Ed.) § 796. Upon the facts disclosed in this case, it would seem that the court below would have been justified in denying the receiver any compensation whatever for his services from the time of his appointment until the appearance of the trust company in the suit. But, however that may be, we are convinced that there was no error in deferring the payment of his compensation for services during that period to the payment of the mortgage and the receiver's certificates, and thereby imposing the burden thereof upon the corporations by whose consent and connivance the receivership was unnecessarily maintained and prolonged.

The principal question on the appeal is whether the mortgage lien is prior and superior to the receiver's certificates. Counsel for the appellants do not contend that the mere order of the court decreeing the receiver's certificates to be a first lien on the property could, without the consent of the mortgagee, have the effect to make them so. It was decided otherwise by this court on the former appeal in this case. International Trust Co. v. Decker Bros., 152 Fed. 78, 81 C. C. 302, 11 L. R. A. (N. S.) 152. But counsel point to various facts in the record which they contend show that the bondholders consented that the lien of the certificates should be prior. One of these facts is that all of the original bondholders save three were stockholders in the Berners Bay Company; but this, if true, would in no way tend to show a waiver of the priority of the mortgage lien. Again, it is said that no interest has ever been paid on any of the bonds. This fact may have been sufficient to cause the bondholders to inquire what was being done with the mortgaged property, but we do not see that the inference is to be drawn therefrom that the mortgage lien was waived. Nor can that inference be drawn from the fact that the companies consented to the appointment of the receiver. But it is said that Endicott, Hackett, Hobart, and Sawyer, who were holders of 78 of the 500 bonds, joined in a request for the appointment of

F. D. Nowell as receiver. No such request appears in the record, but, assuming that it was made, it could have no effect upon the question of the priority of one class of liens to another. It is said, also, that the certificates of $35,000, issued in 1898, afterwards retired by the first issue certificates of $190,000, were taken "by the bondholders in Boston"; but the evidence is that those certificates were issued to Thomas S. Nowell, and were by him assigned to Henry Endicott, a bondholder holding but 13 of the bonds. It is further said that $45,000 in case was advanced by "the bondholders" in anticipation of the first issue certificates of $190,000; but the evidence is that $20,000 of those certificates were sold to Thomas Stokes, who held 10 bonds, $10,000 thereof were sold to David L. Webster, who held 35 bonds, $5,000 to E. Hobart, who held 8 bonds, and $10,000 to Henry Endicott, who held 13 bonds. In other words, four of 30 bondholders, holding 66 of 500 bonds, received $45,000 of the first issue certificates. Assuming that these four bondholders, in view of the terms of the order of the court which made the certificates a first lien on the property, believed that the order was valid, and that in taking the certificates they acquired a lien on the property prior to that of the mortgage, their belief could have no effect upon the law of the case, nor can it be construed into assent upon their part that the mortgage should be displaced as a first lien. Much less could it have that effect upon the trustee, which held the bonds for the great majority of the bondholders.

It is said that the second issue of certificates was ordered, and the issue made, pursuant to a contract between the bondholders and the Mines Securities Company, which points to the fact that the contract must have been known and assented to by the International Trust Company, since that company was to hold the papers in escrow, and was the agent through which payments were to be made. The record shows, however, that the certificates issued under the Mines Securities contract were not of the second issue, but of the first and there is no evidence that the trust company was a party to the agreement or had notice or knowledge thereof, or that any papers were ever placed with it, or that any payments on the contract were ever made through it. The contract was never carried out, and none of the certificates issued under it are held by the appellants in this case.

It is said, also, that of the second issue, certificate No. 2, for $15,996.29, was issued to Wallace Hackett for money payable to the International Trust Company on foreclosure of its mortgage against the American Gold Mining Company, and that in purchasing the certificate Hackett acted as agent for the trust company, and that the latter has never disavowed his act. But there is no proof in the record that Hackett acted under authority from the trust company, or that the trust company had anyhing to do with that certificate, or that the certificate, is among those which are held by the appellants.

The appellants insist that by virtue of the document signed by Wallace Hackett on June 13, 1904, which they designate a "waiver," the bondholders and the trust company are estopped to deny the priority of the receiver's certificates. At the time when Hackett signed that instrument, the first and second series of the issues of receiver's cer-

tificates had been issued and sold, and the waiver could not affect the rights of the holders thereof. If there was an estoppel by virtue of that instrument, it related to the certificates of the third issue only. The waiver recites that Wallace Hackett, for himself and as trustee for the bonds deposited with him, amounting in all to 498, consented to and waived all objection to the orders of the court giving the receiver's certificates priority to the mortgage bonds. The record shows, however, that Hackett, in making that waiver acted without authority from the bondholders other than that which was given him in the contract of February 26, 1903. That contract by its terms gave him no power to waive the priority of a bondholder's lien. On the contrary, its reasonable construction is that it imposed upon him the duty to protect the bonds. His authority was "to do and perform all things necessary for the purpose of carrying out this contract, so far as it devolves upon him," and that authority appears in a contract which elsewhere provides that the Nowells, who were parties thereto, should provide for the prompt payment of the receiver's certificates. Hackett in his deposition testified that he had no recollection of having consulted with any of the bondholders prior to executing the waiver of June 13, 1904. He deposed that he did not at the time investigate the question whether the terms of the contract of February 26, 1903, authorized him to sign the waiver, and that without consulting the bondholders, or giving the matter much thought, he signed the waiver at the request of the receiver's attorneys, and without due consideration, and at a time when it seemed unimportant whether or not there was any priority in the securities; that he never intended to jeopardize the rights of the bondholders, and had no authority to do so; and that he regarded the signing of the instrument a harmless gratification of a request of the receiver, inasmuch as it was based upon the payment of all of the certificates by the Nowells before the bonds were considered in reorganization. In fact, the waiver was signed to carry out a scheme to sell the mining properties to outside people to obtain money wherewith to pay the receiver's certificates and to increase the capital stock, leaving the property subject to the lien of the mortgage. It is intimated by counsel for the appellants that Hackett had a motive for coloring his testimony in favor of the appellees. But whether this is true or not is not important. His testimony is but an admission of what otherwise appears in the record, that he had no authority from the bondholders or from the trust company to sign the waiver. Allusion is made to the circular letter of Hackett to the bondholders of March 31, 1903, as furnishing evidence that the bondholders assented to the waiver which Hackett subsequently signed. That letter, it is true, expresses the opinion of the writer that the bonds are worthless, and that the bondholders are menaced with the danger that the receiver may sell the property, "thus cutting them off entirely." This was but the expression of the writer's view of the rank of the liens, and the fact that in response thereto the bondholders sent him their bonds in order to consummate the contract of February 26, 1903, cannot be deemed an assent to any of such statements so made in the letter.

Before an estoppel can arise, it must appear that the person invoking it has been influenced by and has relied upon the acts or conduct of him who is sought to be estopped, and that those acts and conduct were sufficient to warrant reliance and action thereon. In the present case there is entire absence of proof that the appellants purchased or received any of their certificates in reliance upon any act or conduct of the trust company or of the bondholders, or that they were in any way misled or influenced thereby. The fact that the trust company delayed the foreclosure of its mortgage so many years cannot operate to displace its prior lien. In order to subordinate the receiver's certificates to the vested lien of a mortgage, the proof of the assent of the trustee, or of the bondholders thereto, must be tangible and certain. Farmers' Loan & Trust Co. v. Centralia & C. R. Co., 96 Fed. 636, 37 C. C. A. 528; Belknap Sav. Bank v. Lamar Land & Canal Co., 28 Colo. 326, 64 Pac. 212.

It is assigned as error that the court did not of its own motion require certain of the bondholders to be made parties to the suit, and that the court overruled the motion of the appellants to set aside the decree and make said bondholders parties so that complete justice might be done between the certificate holders and the said bondholders. The motion was made four months after the opinion of the court below was filed, and two months after the findings and decree had been entered, and long after the time for moving for a new trial had expired. The answer of F. D. Nowell, the cross-complaint of the Berners Bay Company, the answer of McBride, receiver, and the petition of intervention of Nowell and Clapp, raised the issue as to the priority of the receiver's certificates over the mortgage. In none of the pleadings was any issue presented as to any specific bonds or any individual bondholder. These pleadings were filed about a year and a half before the decree was rendered. The appellants had ample opportunity to make timely application to bring in additional parties, and no excuse is suggested for their delay. Under the circumstances, we are clearly of the opinion that the trial court committed no error in not, of its own motion, bringing in new parties, and that it was no abuse of the discretion vested in the trial court to deny the application to set aside the decree.

It is said that it appears that the court below reached the conclusion that Thomas Stokes, D. L. Webster, Henry Endicott, Wallace Hackett, F. D. Slade, F. S. Landon, and George K. McLeod, bondholders, waived the priority of their bonds to the receiver's certificates, but this is not sustained by the record. In the opinion the court alluded to the effort to prove estoppel against said bondholders, because of the fact that they had purchased certificates and thereby waived the priority of their bond lien, and said:

"The answer to that is that none of these persons are made parties to this suit. No issues are presented in the pleadings upon which they were required to come before the court. They have not individually had their day in court, and no judgment ought to go against them without notice."

From this language of the opinion, we are not warranted in drawing the conclusion that the court found in the facts disclosed by the evidence proof whereon to hold those particular bondholders estopped.

The motion for leave to bring in additional parties was based upon two grounds: First, that the said bondholders procured and consented to the issuance of receiver's certificates; and, second, that they consented to the orders of the court adjudging those certificates superior liens to the mortgage. Even if the motion below had been presented in apt time, before we would be justified in saying that it was error to deny it, we must find in the record some ground for holding that, if it had been allowed, a different decree might have been rendered. The appellants, in making their motion, offered no suggestion of new proof to be taken to substantiate the defense of estoppel. It was a motion to set aside the decree and to bring in new parties, so that, upon the evidence submitted, the court might render appropriate relief. On that evidence, as we find it upon a careful examination, there is no sufficient proof that the bondholders so named consented that the receiver's certificates should displace the mortgage lien. But the question whether the court erred in denying the application is not properly before us. Where the appeal is from the final decree only, an order subsequently made denying a motion to set the decree aside cannot be reviewed by an appellate court. 3 Cyc. 229; Second Natl. Bank of St. Paul v. Larson, 80 Wis. 469, 50 N. W. 499; Leary v. Leary and Wife, 68 Wis. 662, 32 N. W. 623; L. S. & M. S. Ry. et al. v. C. & W. I. R. R., 100 Ill. 21; Pennsylvania Co. v. Gresco, 79 Ill. App. 127; Kellogg v. Hamilton, 43 Mich. 269, 5 N. W. 315; Aultman Miller Co. v. Becker, 10 S. D. 58, 71 N. W. 753.

The decree is affirmed.