NOWELL et al. v. INTERNATIONAL TRUST CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 24, 1913.)

No. 2,141.

EQUITY (§ 447*)—BILL OF REVIEW—SUFFICIENCY—NEWLY DISCOVERED EVIDENCE.

A bill in the nature of a bill of review set out certain alleged newly discovered evidence, on which it was sought to set aside a decree in a suit by receivers of a mining corporation against controlling stockholders therein, in which it was found that the defendants had sold and agreed to convey to the corporation certain mining claims, and had received the consideration therefor, but had fraudulently altered the records and withheld the most valuable of the claims, and which decree required a specific performance of their contract. *Held*, on a consideration of such evidence, that it was insufficient to impeach the decree, but was entirely consistent therewith, and that the bill was properly dismissed for want of equity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1091–1094; Dec. Dig. § 447.*]

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska; Edward E. Cushman, Judge.

Suit in equity by Thomas S. Nowell, the Nowell Mining & Milling Company, and the Alaska Nowell Gold Mining Company against the International Trust Company, Henry Endicott, William Endicott, Wallace Hackett, C. R. Corning, R. McM. Gillespie, and S. W. Fairchild. Bill dismissed on demurrer, and complainants appeal. Affirmed.

See, also, 89 C. C. A. 318, 162 Fed. 432.

The appellants, as complainants in the court below, filed a bill in the nature of a bill of review to impeach and set aside the final decree rendered in that court, which had been affirmed on appeal to this court in Nowell v. McBride, 162 Fed. 432, 89 C. C. A. 318. That was a suit begun on January 18, 1906, by the receivers of the Berner's Bay Mining & Milling Company, in which suit Henry Endicott intervened by petition as a stockholder of that company. The suit was brought against Thomas S. Nowell and his sons and the Nowell Mining & Milling Company. The bill in the receiver's suit alleged in substance that Thomas S. Nowell and Willis E. Nowell represented to the stockholders and creditors of the Berner's Bay Company the advantage to that company of purchasing 15 certain mining claims, the title to which they represented that they held, and that they would sell the same to the company in consideration of $1,500,000 of the capital stock, and they proposed that the capital stock be increased from $1,000,000 to $2,500,000, and that an additional bonded indebtedness of $300,000 be incurred by the company to provide a fund for working the company's mining properties; that in pursuance of that offer it was agreed that a special meeting of the stockholders of the company should be called to accept the same, and Thomas S. Nowell caused notice to be given that such meeting would be held on June 24, 1896, naming the 15 mining claims in the notice; that the meeting was held, and it was then and there voted to increase the stock, and to increase the bonded indebtedness, and to deliver to Thomas S. and Willis E. Nowell the $1,500,000 of such increased capital stock, and that the company did issue as a purchase price for said mining claims to Thomas S. Nowell and Willis E. Nowell the said shares of capital stock; that, of the group of 15 claims, 3 claims, known as the "Johnson group," constituted the principal value; that after the sale, by the insertion in the offer of sale recorded in the minutes of the stockholders' meeting of the words "last twelve," the true intent and meaning of the transaction was wrongfully and fraudulently changed and altered, and that thereby the claims known as the "Johnson group" were omitted from the offer; that during the times of said transaction all the books and records of the corporation were in the custody of Thomas S. Nowell and Arthur L. Nowell. The petition of intervention of Henry Endicott, one of the stockholders and bondholders of the Berner's Bay Mining & Milling Company, contained similar allegations as to the alterations of the records of the company, and alleged that on June 3, 1896, Thomas S. Nowell proposed to him to convey the 15 claims to the company in exchange for $1,500,000 of the increased capital of the stock, if he, Henry Endicott, would purchase $27,948.35 worth of the then outstanding bonds of that company which were in default, and he alleged that pursuant to said proposition he did purchase the bonds described in the offer. The proof was that he purchased $42,000 worth of said bonds.

On the trial of the issues raised upon the bill, Thomas S. Nowell testified, disclaiming all knowledge of the interlineations and alterations of the records, and denied that any proposition was ever made at the stockholders' meeting to sell the 15 mining claims to the corporation. He did not deny, however, that he had written a letter to Endicott in which he proposed to sell the 15 mining claims to the company, including the 3 in controversy; nor did he deny that he had sent the original notice calling the stockholders' meeting to consider his proposition to sell those claims, in which the Johnson claims were mentioned. Nor did he deny that he had stated to Endicott, six months after the meeting, that the reason why the claims in controversy had not been conveyed to the Berner's Bay Company was that patents had not then been obtained for them. On the issues and the testimony the court found that the allegations of the bill were sustained, and decreed that the 3 Johnson claims be conveyed to the Berner's Bay Company.

It is now alleged in the third amended bill in the present case that at the time of giving his testimony in the receiver's suit the memory of Thomas S. Nowell had become impaired; that there were then in existence certain records, letters, and letter books which would have refreshed his memory, had they been accessible to him; that on October 30, 1905, Wallace Hackett, a director and bondholder of the Berner's Bay Company, wrongfully and fraudulently and without authority obtained possession of the books, docu-

ments, and files of the Berner's Bay Company, by removing them from the place where they were stored in Cambridge, Mass., together with personal books, writings, and documents and files of Thomas S. Nowell which were stored with them, and that the appellants did not discover until September, 1910, that Hackett had removed any more than two certain letterpress copy books, marked "R" and "S," belonging to Thomas S. Nowell, which, in pursuance of an order of the court below, were deposited in court; that Hackett and others, conspiring with him, thereafter continued to conceal and suppress three other and different letterpress copy books belonging to Thomas S. Nowell, which were not produced until some time later. The court below sustained a demurrer to the third amended bill for want of equity, and thereupon the suit was dismissed.

John P. Hartman, of Seattle, Wash., and George M. Nowell, of Boston, Mass, for appellants.

L. P. Shackleford and Shackleford & Bayless, all of Juneau, Alaska, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The question here presented is whether or not the court erred in sustaining a demurrer to the third amended bill for want of equity. The bill presents the newly discovered evidence which is relied upon to show that the decree in Nowell v. McBride was erroneous. That evidence consists of two letters written by Thomas S. Nowell shortly after the stockholders' meeting of June 24, 1896, together with the testimony of one William Payson, who was present at that meeting, and two letters written by William Endicott, and the recitals contained in two agreements which were thereafter executed. It is alleged, also, that if Thomas S. Nowell had had the opportunity to inspect the records which it is alleged were concealed and suppressed, the inspection thereof would have enabled him to recall the reason why the plan to offer the said Johnson group to the Berner's Bay Company had been changed prior to the stockholders' meeting of June 24th, and why it was finally decided by the stockholders of the company that he should not include the Johnson group in said offer. And the true reason is alleged to be that the said Johnson group had not been paid for, that $25,000, the purchase money to the original owners, remained unpaid, and that the financial condition of the Berner's Bay Company did not warrant its assumption of the obligation to pay that sum, and that the creditors of the company and the associates and creditors of Thomas S. Nowell were unwilling to furnish the sum of $25,000. We may pause here to say that there is nothing in the records which are referred to in the bill or in the exhibits thereto to indicate that such was the reason why the Johnson group was excluded from the transaction. Nor does that reason seem to be adequate. It does not seem to have been regarded by Thomas S. Nowell a sufficient reason for not offering to sell the Johnson group to the company, or for not embodying that proposition in a notice of the meeting which was called to accept the offer As the result of that meeting, Thomas S. Nowell received the full amount of stock and bonds which he proposed to take as the

consideration for the transfer of the whole 15 claims. On the trial of the receiver's suit, Thomas S. Nowell did not deny that six months after the stockholders' meeting he stated to Henry Endicott that the reason why the Johnson group had not been conveyed was that a patent had not been obtained for them, a reason which we held to be insufficient.

We may find light upon Thomas S. Nowell's attitude toward this matter by referring to the two letters which are found in an exhibit to the bill, and which are relied upon by appellants as affording ground to impeach the decree in the receiver's suit. On July 17, 1896, about four weeks after the date of the stockholders' meeting, Thomas S. Nowell wrote to Willis E. Nowell, his son, as follows:

"I propose to pay the Johnson drafts the coming week, so that if Fred can carry out my suggestion with Johnson beyond that, and have the mines deeded to the company, it will be all right, and if not, it will be all right, because I shall make the payments, and then the deeds can be made direct to the B. B. Company after the payments are made. I am very glad that I decided not to have the Johnson mines deeded to the company, so as to be on the safe side."

That letter, as we read it, is quite in harmony with the conclusion which was reached by the court in the receiver's suit. The writer is glad that he "decided not to have the Johnson mines deeded." The letter shows that Thomas S. Nowell considered that the whole matter was in his own hands, that he controlled the meeting at which no stockholder other than members of his own family and his attorney and his stenographer were present, and that he caused the alterations of the records to be made to carry out his own individual purposes. It indicates that after that meeting he recognized his obligation, and still contemplated having the mines deeded to the company. The other letter, of date August 11, 1896, was written by Thomas S. Nowell to F. D. Nowell in regard to the Johnson properties. It contains the following:

"I hope to telegraph to the credit of Johnson to the Bank of British Columbia $25,000 within the next week. * * * I have answered you fully in regard to the Johnson mines, and when Willis received the papers showing the transaction I have made, and that we really control three-fifths of the entire Berner's Bay interests. In view of the liberal recognition that my friends have given me here, I think it will be unwise not to fulfill what I have already agreed to put into the company on the last deal. Mr. Plummer thinks that I am very mean in recognizing the people that have helped me to carry matters along, and in view of this fact, if I should do what you suggest in regard to the Johnson mines, why it might augment that sentiment here."

In this letter Mr. Nowell says that he thinks it will be unwise not to fulfill what he has already agreed to put into the company on the last deal. What had he agreed to put into the company on the last deal? Evidently he referred to the Johnson group of claims. He had agreed to put them into the company on the last deal; but, instead of doing so, he had held them out. These letters disclose a remarkable attitude of mind on the part of Thomas S. Nowell. We do not say that they indicate that he had a fraudulent purpose; but they do indicate that he regarded the Berner's Bay Company as his own creature, to do

with as he would, that, notwithstanding his proposition to convey the Johnson group, he was at liberty to convey it or withhold it as he saw fit, with or without the consent of the other stockholders, and without notifying them of his purpose to do so.

In this connection we may refer to the following significant allegations which are found in the bill:

"That although the stockholders of the said Berner's Bay Mining & Milling Company had accepted, at their meeting of June 24, 1896, an offer of the last 12 mining claims named in the recorded and true call to said meeting, and that although the proposed recapitalization of the said company had been carried out after the acceptance of the offer of the said twelve mining claims, the said Thomas S. Nowell was still desirous of securing a conveyance of the said Johnson group to the said company, and that during a period of several months subsequently to June, 1896, the said Thomas S. Nowell was making continued efforts to effect some arrangement with the then owners of the said Johnson group which should result, and was intended to result, in a conveyance of the same to the said company; * * * that the said Thomas S. Nowell did not cease his efforts to secure a conveyance of the Johnson group to the said company by a pledge of its mortgage bonds as security for the payment of the said purchase price therefor until it was found impossible so to do, whereupon it was found necessary that the said Nowells should pay out of their own resources the said purchase price of $25,000, and take title to the said Johnson group themselves."

Here is, indeed, a remarkable admission, and it amounts to this: That the Nowells recognized their moral obligation to convey the Johnson group to the Berner's Bay Company, but did not convey it, because they themselves had to pay for it.

Attached to the bill as an exhibit is a copy of the motion made in this court in the receiver's suit, while the same was pending here on appeal, for leave to insert the affidavit of William M. Payson. The motion is supported by the affidavit of George M. Nowell, and it states that the reason why Payson was not called as a witness was that George M. Nowell had received from a conversation with him the impression that he knew nothing about the matters in controversy as to the stockholders' meeting of June 24th, and therefore could not testify. The affidavit is presented here to show additional evidence that the decree in the receiver's suit should be set aside. There is no showing of diligence to obtain Payson's testimony on the trial of that case, and the excuse which is offered for its omission is not worthy of consideration. But let us, nevertheless, look at what is said in Payson's affidavit. It is that he was an attorney at law, acting for Thomas S. Nowell and his various associates in organizing a number of corporations, among which was the Berner's Bay Company; that the record of the stockholders' meeting of June 24th was written by him in the record book, and is a true statement of what was done at such meeting; that the record was written out in Boston prior to the meeting, and was carried to Portland, Me., where the meeting was held; that at the conclusion of the meeting the record was signed by Barrows as clerk of the corporation; that Arthur L. Nowell, C. O. Barrows, and himself, and no one else, was present at the meeting; that he was at Mr. Thomas S. Nowell's office before the meeting, and at that time they discussed a draft of an offer that included all the

properties named in the call, and that Nowell said, "The Johnson properties are not to go in;" and that the witness then replied that the form of offer would have to be changed, "and I think I then changed it to include the last 12 properties named in the call." And Payson deposed to having recently found in a drawer in his safe a typewritten copy of the recorded call, attested by Arthur L. Nowell, in which the names of the Johnson properties were bracketed in pencil. Payson referred elsewhere to the proxies that were given by the other stockholders.

Now, all that Mr. Payson says in his affidavit may be true, without affording any ground whatever to impeach the decree of the receiver's suit. It may have been, and the two letters of Thomas S. Nowell above referred to and Payson's affidavit tend to indicate that such was the case, that the alterations in the notice and the offer were made before the meeting, and not after; that Thomas S. Nowell, shortly before the meeting, and without consulting any one, decided to hold out the Johnson group of claims, and instructed Mr. Payson to prepare the records of the meeting accordingly; and that his son, Arthur L. Nowell, holding the proxies of the other stockholders, accepted, without their knowledge or consent, the altered proposition, all of which, if true, would go to show that, as to Henry Endicott and the other stockholders, the transaction was just as fraudulent as it would have been if the records had been fraudulently altered after the meeting. There is nothing in all this evidence so offered which, taken to be true, tends in any degree to impeach the decree in the receiver's suit, or to show that from and after June 24, 1896, the Berner's Bay Mining & Milling Company was not in equity the owner of the Johnson group of claims, which it paid for in pursuance of Thomas S. Nowell's offer to sell the same. Whether the alterations were made before or after the meeting, it is clear from the evidence in the receiver's suit that Henry Endicott and the other stockholders were not advised of them, that they believed that Nowell's proposition had been accepted, and Henry Endicott, relying thereon, and to carry out his part of the agreement, purchased $27,948.35 worth of the then outstanding bonds of the company which were in default, and bonds in addition thereto to the amount of $42,000.

The other items of evidence which are set forth in exhibits to the bill are presented for the purpose of showing that Henry Endicott, William Endicott, and Wallace Hackett, stockholders of the Berner's Bay Company, recognized the title of Thomas S. Nowell to the Johnson group of claims long after June 24, 1896. The first of these is a letter from William Endicott to Thomas S. Nowell, of date September 13, 1900, in which Endicott referred to certain possible purchasers of the company's mining claims who had expressed the opinion that there was no development to justify their paying much money for them, and said:

"I was afraid yesterday that they would decline altogether; but Mr. Agassiz is to be in town on Friday, and Col. Livermore will talk it over with him, and see if he is willing to go in on the basis of putting up cash to pay the receiver's certificates and the Alaska debts, not to exceed $150,000, and to develop the property, including the Johnson, and to have 51% of the new company—the 49% to be made sufficiently large to fund the bonds and floating

debt and to furnish $500,000 in shares for the Johnson mines. * * * If we hear from you that you will put in the Johnson, we shall not hesitate to trade."

Also a letter, of date July 18, 1905, from William Endicott to Thomas S. Nowell, in which it is said:

"If the property is what you believe it to be, what you can receive for the Johnson will be quite a fortune in itself. As to your debts, it may relieve you somewhat if I make the following proposition," etc.

And the writer proceeds with an offer by which Nowell can be relieved of the debt he owed the writer of $825,510.67. Also an agreement made February 6, 1902, between certain corporations and the majority of the holders of the mortgage bonds of the Berner's Bay Company, in which the Nowell Mining & Milling Company is described as "the owners of what is known as the Johnson properties, located near the Northern Belle Gold Mining Company's property in Alaska," which agreement was signed by Henry Endicott and Wallace Hackett as holders of the mortgage bonds. Also a memorandum of an agreement between the holders of first mortgage bonds of the Berner's Bay Company, parties of the first part, Wallace Hackett, Trustee, party of the second part, and Thomas S. Nowell, Frederick D. Nowell, and Willis E. Nowell, parties of the third part, made on February 26, 1903, in which it is recited that certain named mining properties shall be maintained in their integrity together with the group of mines "known as the Johnson group, and organized into a corporation under the name of the Nowell Mining & Milling Company, which said Nowell Mining & Milling Company is the exclusive property of the parties of the third part." The purport of the agreement was that the owners of the Johnson properties would add the same to the properties of the Berner's Bay Company, so that the same might be formed into one corporation for the purpose of selling to purchasers.

Now, all of the evidence afforded by these exhibits is in line with the proof that was brought before the court in the receiver's suit. It goes to sustain our conclusion in that case, where we said:

"As to the delay of the intervener Endicott in asserting his rights, his testimony is that he did not discover the fraud until some six months after the stockholders' meeting, and that at that time, in a conversation with Thomas S. Nowell, the latter informed him that the reason why the mines had not been conveyed was 'that they could not convey them, for they had not procured the patent yet.' Endicott testified, further, that thereafter he made search for Nowell's letter to him of June 3, 1896, concerning the proposed sale of the 15 mining claims to the company, but that he could not find it until 1900, and that thereafter Nowell was making endeavors to sell the Berner's Bay and Johnson property together, and that he (Endicott) was more anxious to realize on such deal than to delay the consummation of the same by litigation over the title of the Johnson properties. But he testified that, on finding the letter, he sent a copy thereof to Nowell, and informed him 'that we consider we have at least a moral claim on the Johnson property.'"

It is alleged that the decree in the receiver's suit is void for want of jurisdiction, that the District Court at Juneau decided that the appointment of F. D. Nowell on February 12, 1898, as receiver of the property of the Berner's Bay Mining & Milling Company was void, and that this court affirmed that decision in Nowell v. International

Trust Company, 169 Fed. 497, 94 C. C. A. 589, and that therefore, in January, 1906, there was no legal receiver to institute the receiver's suit in question. We did not decide in Nowell v. International Trust Company that the appointment of the receiver was void. We reviewed a record in which it appeared that in an action brought by Decker Bros. to recover $154.65 for goods sold and delivered to the Berner's Bay Mining Company and to protect the plaintiffs against liabilities on certain checks and drafts that they had signed, the complaint alleged the propriety of the appointment of a receiver on the ground that the output of the mines for the six months prior to the commencement of the suit was insufficient to meet current expenses, and that creditors were threatening suit, and that the property of the defendant company was in danger of being wasted and exhausted, and that if the property were sold at forced sale there would not be realized a sum sufficient to pay its indebtedness. We held that upon the allegation of the complaint no proper case was made for the appointment of a receiver in the first instance, and that upon the payment of the claim of the plaintiffs in that action, F. D. Nowell, who had been substituted as receiver, should have reported that fact to the court and obtained his discharge. We said:

"During the whole of the time from his (F. D. Nowell's) appointment as receiver until the appearance of the International Trust Company in the suit, a period of nearly eight years, there was no controversy before the court."

And we held that, if the corporations defendant to that suit chose to submit to the situation and to conduct their mining operations all those years through the medium of a receiver, they should be held responsible for the expense of the receivership. It appeared in that case that on December 9, 1905, the Berner's Bay Company and the corporations connected with it answered the complaint of Decker Bros., alleging that the receiver had issued under the orders of the court receiver's certificates to the amount of nearly $400,000 for money which he had borrowed and used in the administration of the property and the operation of the same; that on March 5, 1906, the International Trust Company intervened, setting up its mortgage, which was a deed of trust, and obtained leave to commence an independent suit for the foreclosure of the mortgage as a prior lien; that on April 11, 1907, the court ordered that the two suits be consolidated. We may assume, nothing in the record appearing to the contrary, that the court extended the receivership to the foreclosure suit. That record shows, further, that on January 3, 1906, W. B. Hoggatt was appointed coreceiver with F. D. Nowell, and in the order appointing him he and his coreceiver were directed to institute the receiver's suit for the recovery of the Johnson group of mines. At that time the pleadings presented ample grounds for the appointment of a receiver, and the order appointing Hoggatt and the order that he bring the suit were clearly within the jurisdiction of the court, notwithstanding that the appointment of a receiver in the first instance may have been voidable.

The demurrer to the bill in this case was properly sustained.

The decree is affirmed.

WOLVERTON, District Judge, concurs.